The Carnegie Center Company, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 30353.    Filed September 17, 1954.

*Richard R. Hollington, Esq.*, for the petitioner.
*James F. Kennedy, Jr., Esq.*, for the respondent.

#### OPINION.

Murdock, *Judge:* The Commissioner determined a deficiency of $2,304.64 in income tax for the petitioner's first fiscal year beginning November 1, 1944, and ending October 31, 1945. The petitioner does not contest any of the adjustments made by the Commissioner in determining the deficiency but contends that it is entitled to a refund based upon a larger deduction for depreciation on three buildings than was claimed on its return and increased by the Commissioner in determining the deficiency. The difference between the parties is whether the petitioner should use the basis used by its predecessor for depreciation on the buildings, as claimed and allowed on the return, or whether it is entitled to use a larger basis, representing either the alleged cost of the buildings to the petitioner or, in the alternative, the alleged correct basis of the predecessor. The facts have been presented by stipulations which are adopted as the findings of fact. The return was filed with the collector of internal revenue for the eighteenth district of Ohio.

The Owners Investment Company, organized in 1928, acquired two 99-year leases on property in Cleveland, Ohio. The leases were renewable forever and each contained an option to purchase the fee. "Ninety-five per cent of its stockholders were also stockholders, officers and directors of the Austin Company," hereafter called Austin. Owners contracted with Austin for the construction of three office buildings on its leased property. The buildings were completed in 1930 at an approximate cost of $2,000,000 which "exceeded the proceeds from the first mortgage loan plus the capital invested by the stockholders and this excess of approximately $1,000,000 became an obligation to The Austin Company in the form of a note later to be secured by a second mortgage on the properties." Owners became insolvent and Austin foreclosed on its second mortgage note in Novem-

ber 1937. Austin bid $832,500, the only bid, and acquired the properties at the foreclosure sale, making payment by applying a part of the amount due on its note. Austin claimed and was allowed a deduction for the balance due on its note and thereafter "considered that its unadjusted basis of the property for tax purposes was $832,500." The fair market value of the three buildings in 1937 was $1,150,000. The record does not show what was done in regard to the first mortgage on the Owners property or what the amount of that debt was.

Austin organized the Carnegie Medical Building Company and the Upper Carnegie Building Company late in 1938 and transferred the properties to them in exchange for all of their stock, the exchanges being nontaxable transactions under the Internal Revenue Code.

The petitioner, wholly owned by The T. W. Grogan Company, was organized in July 1944 for the purpose of acquiring control of the three office buildings owned by Carnegie Medical and Upper Carnegie, together with the underlying and adjacent lands. The petitioner intended to use funds to be loaned by Western and Southern Life Insurance Company. The latter demanded a first mortgage secured by the fee simple title to the lands, together with the improvements. It thus became necessary to acquire title to the leased land.

Austin offered on July 12, 1944, to sell to the petitioner all of the stock of Carnegie Medical and Upper Carnegie, together with three adjacent lots, for 2,500 shares of nonvoting 3 per cent $100 par preferred stock of the petitioner, $500,000 in cash, plus the book value of assets of the two subsidiaries other than real property less their liabilities. The offer also stated that the subsidiaries would give the 60-day notice, required to exercise the options to purchase the leased properties, one at $680,000 and the other at $260,000, when the petitioner had deposited $940,000 with a bank as escrow agent to be used to obtain the deposit of the deeds with the same escrow agent. The right to the use of the deposited funds for the payment of one option price was not to be dependent upon the payment of the option price on the other property. All stock, deeds, and cash mentioned were likewise to be deposited with the escrow agent. The insurance company stated the terms upon which it would advance the funds to enable the petitioner to acquire the fee simple title to the lands on which the buildings were located. The petitioner accepted Austin's offer on August 17, 1944, except that they agreed that a commitment of the insurance company would be deposited instead of the actual cash. Austin wrote a letter as follows to the petitioner on October 24, 1944, which was accepted by the petitioner on October 26, 1944:

Our letter of July 12, 1944 and your acceptance letter of August 17th, 1944, constitute an agreement between us for the acquisition by you of certain real estate owned by The Austin Company in fee simple, and all of the authorized and

outstanding capital stock of Carnegie Medical Building Company and Upper Carnegie Building Company. Although that agreement contemplated that the two last named corporations would be merged with The Carnegie Center Company, there is no specific provision therein for the execution of a merger agreement by the three companies prior to the date of closing, or for the deposit of such agreement with the escrow agent in order that it may become effective as of the date of closing. Also, our agreement as it now stands does not specifically state what part of the total cash payable to us represents the purchase price of the real estate which we are to convey to you. The purpose of this letter is to define the understanding between us as to such matters. Upon your acceptance hereof, this letter will become effective as amending and supplementing our original agreement.

(1) We will cause the present directors and shareholders of Carnegie Medical Building Company and Upper Carnegie Building Company to approve the merger of these two companies into your Company and thereupon will cause said two companies to execute a merger agreement in the form which we have discussed and agreed upon. This agreement will provide for the payment and distribution to The Austin Company, as owner of all of the stock of the two companies, of the 2,500 shares of preferred stock in your Company provided for in our original agreement and of the cash specified therein, except that for the purposes of the merger agreement the total cash payment as provided for in our original agreement shall be reduced by the sum of $67,250.00, the total purchase price of the real estate to be conveyed to you by us. Said merger agreement shall not become effective by its terms until the closing date and unless the provisions of our agreement are completely carried out.

(2) The real estate owned by us and described in our original agreement shall be sold and conveyed to you by us entirely independently of any provision of said merger agreement, for the following cash considerations:

| | |
|---|---|
| East 102nd Street Property | $6,000.00 |
| East 105th Street Property | 11,250.00 |
| East 107th Street Property | 50,000.00 |
| Total Purchase Price | $67,250.00 |

(3) Our deed for the aforesaid real estate shall be deposited with National City Bank as escrow agent, as provided in our original agreement but the purchase price payable to us, after tax adjustments and other deductions authorized by our agreement, shall be in addition to the cash payment provided for by the merger agreement. The total cash and property to be paid and distributed to us, however, under said merger agreement and as the purchase price of said real estate shall remain as specified in our original agreement.

However, since it may be impracticable to determine by the date of closing the exact amount of the "additional sum" provided for by said agreement, which is based on adjusted balance sheets of Carnegie Medical Building Company and Upper Carnegie Building Company, it is agreed that the transaction may be closed by the National City Bank as escrow agent when it has available as such "additional sum" a minimum or approximate amount to be agreed upon between us and that as soon as possible after the date of closing an adjustment will be made between us, either through the escrow agent or outside of the escrow so that the total amount paid on account of such "additional sum" will be in accordance with our original agreement.

We understand that Carnegie Medical Building Company and Upper Carnegie Building Company will, by reason of the exercise of their options under their

respective 99 year leases, acquire the fee simple titles to the leased properties prior to the closing date under our agreement. It is, therefore, agreed that on or prior to the closing date the fee simple estates in the leased properties shall not be considered as assets, nor shall any obligations or expenses in connection with the acquisition of such fee simple titles be considered as liabilities for the purpose of the balance sheet determination of such "additional sum".

Carnegie Medical and Upper Carnegie gave the 60-day option notices to their lessors on August 24, 1944. An agreement of merger was executed by Carnegie Medical, Upper Carnegie, and the petitioner, and the merger was approved by the directors of the first two corporations, all on October 24, 1944. The certificate of merger was issued on October 26, 1944.

The deposits with the escrow agent were made on October 24 and 27 and the transfers were made by the escrow agent on October 30, 1944. The petitioner thereby became the owner, and continued to be the owner during the taxable year, of the following assets having the following values as of November 1, 1944:

| | |
|---|---|
| Assets formerly of the merged corporations, other than land and buildings, less liabilities | $150, 932. 59 |
| Land | 267, 250. 00 |
| Buildings | 1, 420, 000. 00 |

The escrow agent paid the option prices, paid Austin $500,000 in cash, including $67,250 for its separate real estate, and the other expenses of the transfer, including taxes.

The remaining useful life of the buildings from November 1, 1944, was 29 years.

The only outstanding stock of the petitioner when the above transaction was completed consisted of 5 shares of no par common having a stated value of $100 per share and 2,500 shares of $100 par value preferred, the latter having been issued to Austin.

The Commissioner explained one of his adjustments as follows in the statement enclosed with the notice of deficiency:

(e) Additional depreciation has been allowed in the amount of $1,711.47. This depreciation applies to capital expenditures claimed as expense by a predecessor corporation for the year 1942 and to capital expenditures included as expense on your return for the taxable year. The substituted basis of the predecessor corporation of the improvements capitalized in the year 1942 is held to be the basis for depreciation of these assets after transfer to your corporation in liquidation of the predecessor, The Carnegie Medical Building Company. Your various contentions in a claim for refund filed on December 30, 1949 that depreciation claimed on your return for the taxable year should be substantially increased, based upon a reallocation of the basis shown on your books and return for land and buildings has been rejected.

The petitioner argues that the various steps were integral parts of an inseparable transaction whereby, in substance, if not in form, it purchased the land and buildings for a single lump sum, the total

amount paid for the buildings and the land on which they stand, which must be allocated between the two in proportion to the fair market value of each, as provided in Regulations 111, section 29.23 (1)–4. The result would be to allocate as cost of the buildings a large part of the $940,000 paid to the owners of the land, the option prices at which they had agreed to sell their land to their lessees. The stipulated facts show, as the petitioner contends, that the petitioner successfully tried to tie together the several necessary contractual arrangements to the end that it became the absolute owner of the land and buildings. The Austin subsidiaries owned the buildings and the leases providing the options, others owned the lands, and the insurance company had money to loan. The petitioner made the necessary arrangements whereby, through the escrow agent, the Austin subsidiaries exercised their options, the insurance company advanced the $940,000 to pay the landowners and the additional amounts going to Austin, the land and the 'Austin subsidiaries' stock were transferred to the petitioner, the petitioner became indebted to the insurance company and gave a mortgage on the land and buildings as security for the money loaned, and the petitioner issued its preferred stock to Austin, all practically simultaneously as was necessary and intended. The petitioner also points out that each option price was in excess of the stipulated fair market value of the land alone and argues that it obviously must have acquired something more valuable than the land alone.

It is not proper, however, to regard any part of the $940,000 as cost of the buildings since clearly that was paid, from funds borrowed by the petitioner, to the landowners solely for their title to the land, which carried with it their rights under the leases. Apparently the landowners' rights under the leases had become valuable and the petitioner was willing to pay them more than the land unleased would have been worth at the time, perhaps to avoid future payments of ground rents. Thus, the petitioner in its reply brief suggests as an alternative that a part of the $940,000 should be allocated in some way to the leases. No reason or basis for such allocation has been shown. Cf. *Martha R. Peters*, 4 T. C. 1236. The main issue here is the basis for depreciation of the buildings. No part of the $940,000 was paid or received for the transfer of the buildings. They were owned not by the landowners, but by the Austin subsidiaries. The provisions of Regulations 111, section 29.23 (1)–4, providing, where necessary, for the allocation of a lump sum paid without segregation for more than one asset, do not apply in a case like this where the buildings were acquired from one source and the land from another owner and there is no uncertainly about the consideration paid for the land or any confusion between that and the consideration which enabled the petitioner to acquire the buildings. There is, thus, no justification for

regarding any part of the $940,000 as a part of the depreciable base of the buildings. The result would have been the same had the lessees bought the land at the option prices.

The above conclusion is fatal to the main argument of the petitioner that in one way or another a part of the $940,000 should be included in the depreciable base of the buildings. The Commissioner points out that the landowners had no depreciable interest in the buildings, argues that the petitioner acquired them in a tax-free reorganization, by absorbing into itself by merger Carnegie Medical and Upper Carnegie, as a result of which it must take the same bases for depreciation which the buildings had in the hands of the two merging corporations, citing *Southwest Natural Gas Co.*, 14 T. C. 81, affd. 189 F. 2d 332, certiorari denied 342 U. S. 860. The petitioner, as an alternative, also contends that it is entitled to use the same bases which the merging corporations were entitled to use. Both parties go back for that basis (unadjusted) to the foreclosure of the second mortgage through which Austin acquired the buildings in 1937 and agree that it was entitled to use thereafter $1,150,000 as its basis. They both ignore, without justification so far as the Court has been shown, the first mortgage theretofore placed upon the buildings but since evidence on that point might help but not hurt the petitioner, who has the burden of proof, the Court will likewise ignore the point. The $1,150,000 figure is the fair market value of the buildings at the time of the foreclosure. The only argument of the Commissioner against the use of that amount as the unadjusted basis of the petitioner is that the petitioner is estopped to use it by the action of Austin in deducting for 1937 the difference between its bid price of $832,500 and the larger amount of the debt owed it at that time by Owners instead of reporting as gain the excess of the fair market value of the buildings over the amount of that indebtedness. Estoppel must be pleaded and proven by the party desiring to raise such a defense. *Helvering* v. *Salvage*, 297 U. S. 106; *John B. Hollister*, 44 B. T. A. 851; *William R. Collins*, 18 T. C. 99, 104, affirmed per curiam 203 F. 2d 565. The Commissioner has done neither. Thus, this record justifies the use by the petitioner of $1,150,000, reduced by allowed or allowable interim depreciation deductions, as its basis for depreciation of the buildings. The parties, apparently, can agree upon the proper interim deductions and the deduction for the taxable year with that figure established as a starting point.

*Decision will be entered under Rule 50.*

VAN FOSSAN, *J.*, did not participate in the consideration of or decision in this report.