RICHARD R. RISS, SR., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3794–62, 3795–62, 3879–62, 3178–66.  Filed May 24, 1971.

[1] Richard R. Riss, Sr., and Helen Gossard Riss, docket No. 3795–62; Transport Manufacturing & Equipment Co. of Delaware, docket No. 3879–62; and Richard R. Riss, Sr., docket No. 3178–66.

*Guy A. Magruder, Jr.,* and *Richard M. Erickson,* for the petitioners.
*Donald W. Wolf,* for the respondent.

Irwin, *Judge:* Respondent determined deficiencies in petitioners' income tax for the following years:

| Name | Docket No. | Year | Deficiency |
|---|---|---|---|
| Richard R. Riss, Sr. | 3794-62 | 1957 | $138,428.05 |
| | | 1958 | 182,981.25 |
| | | 1960 | 120,614.85 |
| Richard R. Riss, Sr., and Helen Gossard Riss | 3795-62 | 1959 | 53,346.96 |
| Richard R. Riss, Sr. | 3178-66 | 1962 | 93,326.54 |
| | | 1963 | 83,077.01 |
| Transport Manufacturing & Equipment Co. of Delaware | 3879-62 | 1957 | 863,236.09 |
| | | 1958 | 126,853.01 |
| | | 1959 | 161,793.31 |
| | | 1960 | 104,501.22 |

Certain concessions having been made by the parties, the issues remaining for decision are:

Issue *1:* Whether petitioner Transport Manufacturing & Equipment Co. of Delaware (hereinafter T.M.E.) acted properly in not recognizing, as gain, any part of the $3,904,000 which is received from the sale of certain used trailers during the year 1957.

Issue *2:* Whether a $1,383,029.71 debt owed to T.M.E. by Riss & Co., Inc., was properly treated as a bad debt on T.M.E.'s income tax for the year 1960.

Issue *3:*

A. Whether expenditures associated with the maintenance of certain parcels of residential property were properly deductible by T.M.E.

B. Whether losses attributable to the disposition of certain automobiles, formerly devoted to the personal use of T.M.E.'s shareholders, were properly deductible by T.M.E. under section 165.

Issue *4:* Whether T.M.E. was entitled to a net operating loss carryback from the year 1960.

Issue *5:* Whether, as a result of certain guarantee payments (totaling $125,000) which were made by petitioner Richard Riss, Sr. (hereinafter Richard), during the year 1963, Richard was entitled to a bad debt deduction of $125,000 in that year.

Issue *6:* Whether various expenditures incurred by Richard in connection with a tract of land which he owned in Kansas City, Mo., were properly deductible as costs associated with the maintenance of property held for the production of income.

Issue *7:* Whether the sale to Richard of shares of stock held by T.M.E. in six related corporations constituted a constructive dividend to Richard.

Issue *8:* Whether Richard was entitled to a net operating loss carryback from the year 1963.

Some of the facts have been stipulated by the parties. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

During the years under consideration, petitioner Transport Manufacturing & Equipment Co. of Delaware (T.M.E.) was a corporation, existing under the laws of the State of Delaware. Its principal office at the time its petition herein was filed was located in Kansas City, Mo. For each of the years 1957 through 1962, inclusive, T.M.E. filed U.S. Corporation Income Tax Returns with the district director of internal revenue at Kansas City, Mo. Additionally, on May 23, 1962, T.M.E. filed with the district director of internal revenue at Kansas City, Mo., an amended U.S. Corporation Income Tax Return for the year 1960. T.M.E.'s books were kept on a calendar year basis.

Petitioners Richard R. Riss, Sr., and Helen Gossard Riss are husband and wife and resided at Kansas City, Mo., at the time the petition in docket No. 3795–62 was filed. Petitioners filed a joint Federal income tax return for the taxable year ending December 31, 1959, with the district director of internal revenue at Kansas City, Mo. Because Helen Gossard Riss is a party to this case only by virtue of having joined with her husband in filing their Federal income tax return for the year in issue, reference to the "petitioner" will hereinafter be limited to either T.M.E. or Richard.

At the time Richard filed his petition in docket No. 3794–62 he was a resident of Kansas City, Mo. At the time he filed his petition in docket No. 3178–66, he was a resident of Cripple Creek, Colo. For each of the years covered by these dockets, i.e., 1957, 1958, 1960, 1962, and 1963, Richard filed an individual Federal income tax return with the district director of internal revenue at Kansas City, Mo. These returns were filed on a calendar year basis.

A. Issues Relating to Transport Manufacturing & Equipment Co. of Delaware, Docket No. 3879–62

*Issue 1. 1957 Sale of Trailers to Fruehauf*

FINDINGS OF FACT

Riss & Co., Inc. (hereinafter Riss), is an interstate motor carrier, founded by Richard in 1927. During the years 1945 through 1957, Richard served as its board chairman; and during the years 1957 through 1964, Richard was Riss' president.

As a result of its status as a common carrier, Riss was at all times herein pertinent subject to the rules and regulations of the Interstate

Commerce Commission (hereinafter the Commission). One of the rules promulgated by the Commission required a hearing whenever a carrier, with more than $500,000 in debt and equity, sought to incur further indebtedness in the purchase of equipment. Because the "hearing requirement" often proved to be a lengthy undertaking, an industry-wide practice was developed to avoid the delays inherent in the hearing process. The technique employed was to set up an independent corporation whose function it would be to purchase all of the equipment needed by the carrier. The equipment would then be leased to the carrier for a period approximating the useful life of the equipment.

T.M.E.'s emergence in 1938 marked the beginning of Riss' participation in this method of purchasing equipment. During this time and up to 1950, Richard was T.M.E.'s president. After 1950 and until 1955, T.M.E. was presided over by Richard's son, Richard R. Riss, Jr. In 1955, Richard resumed the presidency of T.M.E. and remained in that position until 1965 when T.M.E. was liquidated. During the years depicted below, T.M.E. common stock was owned by the following members of the Riss family: [2]

| Name | Shares | | | |
|---|---|---|---|---|
| | 1/1/57 to 5/13/58 | 5/13/58 to 4/25/61 | 4/25/61 to 11/22/61 | 11/22/61 to 12/31/63 |
| R. R. Riss, Sr. | 520 | 520 | 1,020 | 1,520 |
| R. B. Riss | 500 | 500 | | |
| Louise V. Riss | 500 | 500 | 500 | 500 |
| R. R. Riss II | | 500 | 500 | |

Since T.M.E. was designed merely to serve as a conduit for equipment needed by Riss, it was never intended that T.M.E. would reap a profit of any significance from its dealings with Riss. Accordingly,

[2] The outstanding capital stock of Riss during the period Dec. 31, 1956, to Dec. 31, 1963, inclusive, was held as follows:

(1) 20,000 shares of class A common voting stock was owned by Richard R. Riss, Sr., during entire period.

(2) Class B common non-voting stock was held as follows:

| Name | 1/1/57 to 5/22/57 | 5/22/57 to 8/22/58 | 8/22/58 to 5/15/59 | 5/15/59 to 4/25/61 | 4/25/61 to 11/22/61 | 11/22/61 to 12/31/63 |
|---|---|---|---|---|---|---|
| Richard R. Riss, Sr. | 341.216 | 341.216 | 343.207 | 10,343.207 | 33,899.453 | 45,425 |
| Robert B. Riss | 21,467.813 | 21,467.813 | 10,942.273 | 10,942.273 | | |
| Louise V. Riss | 32,575.007 | 32,575.007 | 22,050.274 | 22,050.274 | 22,050.274 | 32,575 |
| E. E. Pick | 10,000 | 10,000 | 10,000 | | | |
| Edward S. Riss | 6,054 | 4,203 | 4,203 | 4,203 | | |
| Georgina L. Riss | 6,054 | 4,203 | 4,203 | 4,203 | | |
| Margie Ann Riss | 500 | 500 | 500 | 500 | 500 | 500 |
| Toni Palette Riss | 500 | 500 | 500 | 500 | 500 | 500 |
| Victoria L. Riss | 500 | 500 | 500 | 500 | 500 | 500 |
| Richard R. Riss II | 1,000 | 1,000 | 22,050.273 | 22,050.273 | 22,050.273 | |
| R. R. Riss III | 500 | 500 | 500 | 500 | 500 | 500 |
| D. C. Stone | 1.991 | 1.991 | 1.991 | 1.991 | | |
| C. H. Rhodebeck | 1.991 | 1.991 | 1.991 | 1.991 | | |
| S. W. Bell | 1.991 | 1.991 | 1.991 | 1.991 | | |
| W. C. Dannevik, Jr. | 1.991 | 1.991 | | | | |
| Laura B. Riss | 500 | 4,202 | 4,202 | 4,202 | | |

most of the equipment which Riss obtained from T.M.E. was provided on a "net lease" basis—Riss paying T.M.E. a monthly rental which was determined by the method of depreciation employed by T.M.E. in expensing the rented equipment, plus a monthly stipend which was designed to cover T.M.E.'s overhead and interest expense, and provide it with a small profit factor. Since T.M.E. customarily used the "double declining-balance" method of depreciation in writing off its equipment, Riss' rental payments were very high during the early years of a lease, and very low during the later years.[3] Additionally, since the rental agreement was in the form of a "net lease," Riss absorbed all costs of maintenance, and any related charges such as taxes and duties.

Though T.M.E. was primarily liable for the cost of equipment which it purchased, in most instances, Riss was secondarily liable in the event T.M.E. defaulted. As security for the purchase-money mortgage which T.M.E. typically executed in favor of the seller of such equipment, T.M.E. would usually assign to the seller the leasehold agreement under which the equipment in question was leased to Riss.

In 1954, T.M.E. purchased from the Fruehauf Trailer Co. (hereinafter Fruehauf) 400 aluminum refrigerated trailer vans (hereinafter referred to as "reefers"), 800 aluminum trailer vans, and 16 tank trailers. Total cost for the 1,216 trailers purchased was $8,471,294—20 percent payable on delivery, with the balance payable over a period of 60 months. By leasehold agreements dated April 1, 1954, and December 3, 1954, respectively, the trailer vans and tank trailers were leased to Riss for 6-year terms. The following schedules represent the amount of rent for which Riss was responsible during each of the years covered by the leasehold agreement:

(A) 800 nonrefrigerated trailer vans:

| Year of service | Monthly rental | Monthly rental per unit | Year of service | Monthly rental | Monthly rental per unit |
|---|---|---|---|---|---|
| 1st | $144, 632 | $180. 79 | 4th | $52, 896 | $66. 12 |
| 2d | 102, 328 | 127. 91 | 5th | 50, 152 | 62. 69 |
| 3d | 73, 216 | 91. 52 | 6th | 43, 160 | 53. 95 |

[3] By way of example, if T.M.E. purchased a trailer for $6,000, with an estimated life of 6 years, T.M.E.'s depreciation deductions and Riss' rental payments during the leasehold period (which would coincide with the estimated life of the trailer) would be as follows:

| | Basis | T.M.E. depreciation deduction | Riss annual rental [1] |
|---|---|---|---|
| Year 1 | $6, 000. 00 | $2, 000. 00 | $2, 000. 00 |
| Year 2 | 4, 000. 00 | 1, 333. 33 | 1, 333. 33 |
| Year 3 | 2, 666. 67 | 888. 89 | 888. 89 |
| Year 4 | 1, 778. 78 | 592. 92 | 592. 92 |
| Year 5 | 1, 185. 86 | 395. 29 | 395. 29 |
| Year 6 | 790. 57 | 263. 52 | [2] 263. 52 |
| Total | | 5, 473. 95 | |

[1] Does not include interest or nominal profit and overhead factor of $10 per month per vehicle included Riss' rental payments.
[2] At the end of the leasehold agreement Riss was usually given the option of purchasing the rented equipment at T.M.E.'s book value.

(B) 400 refrigerated trailer vans (reefers):

| Year of service | 186 of 400 | | 214 of 400 | |
|---|---|---|---|---|
| | Monthly rental | Monthly rental per unit | Monthly rental | Monthly rental per unit |
| 1st | $48,490.28 | $260.48 | $55,982.40 | $261.60 |
| 2d | 34,024.98 | 182.93 | 39,313.94 | 183.71 |
| 3d | 24,098.16 | 129.56 | 27,841.40 | 130.10 |
| 4th | 17,167.80 | 92.30 | 19,831.38 | 92.67 |
| 6th | 16,230.36 | 87.26 | 18,748.54 | 87.61 |
| 7th | 13,849.56 | 74.46 | 15,994.36 | 74.54 |

(C) 16 tank trailers:

| Year of service | Monthly rental | Monthly rental per unit | Year of service | Monthly rental | Monthly rental per unit |
|---|---|---|---|---|---|
| 1st | $3,750.72 | $234.42 | 4th | $1,338.72 | $83.67 |
| 2d | 2,637.92 | 164.87 | 5th | 1,266.88 | 79.18 |
| 3d | 1,873.44 | 117.09 | 6th | 1,085.60 | 67.85 |

In accordance with the practice discussed earlier, T.M.E. assigned the leases for the above transactions to Fruehauf as security for the mortgage which it (T.M.E.) had executed.

Of the 1,200 trailer vans purchased, all of the reefers and 499 of the nonrefrigerated vans were of an experimental design in that aluminum components, such as aluminum undercarriages and dollies, had replaced trailer parts usually constructed of steel. The new design features proved to be unworthy of the heavy demands placed upon them, and during the first 3 years of their use, many repairs were required to keep them in running condition. Additionally, leakage, alleged by Riss to have been caused by faulty construction in the area of the trailer where the walls were joined to the roof, resulted in additional repairs and modifications. By early 1957, Riss estimated that, as a result of these problems, it had lost between $700,000 and $800,000, all of which it thought should be made good by Fruehauf which it deemed to be at fault. The faulty undercarriage assembly was the subject of many complaints which Richard lodged with Fruehauf's president, Roy Fruehauf.

The problems described above came at a time when Riss' gross revenues from shipping were on the decline. During the years encompassed by the Korean War, Riss was heavily involved in the transportation of explosives. Indeed, its peak revenue year was 1953. However, with the cessation of hostilities in that year, there was a substantial decline in the movement of explosives within this country, and Riss began to look to other markets. During the ensuing years, in addition to explosives, it shipped manufactured goods of all varieties, produce, clothing, and some frozen foods. Even so, labor problems, the equipment problems discussed above, and a variety of

other commercial ailments caused it to incur steady losses in the 1954–56 post-Korean War period.[4]

Around 1957, Richard, while looking for ways of improving Riss' waning financial picture, became very interested in the frozen food market. During the early part of that year, he made a trip to Florida where he was advised by the Snow Crop frozen food company that they would be interested in employing Riss as a carrier. However, if Riss were to become involved in the shipment of frozen foods, it first had to do something to upgrade its fleet of reefers whose refrigerator units and insulation provisions were inadequate for the type of frozen food transportation envisioned by Richard.

Whether the transactions which are about to be described were the product of Richard's desire to enter the frozen food market, or the culmination of several years of frustration and difficulty arising from the design of the trailers purchased from Fruehauf in 1954 is not entirely clear; however, by agreements dated January 16, 1957, and July 16, 1957, Fruehauf undertook to purchase from T.M.E. 814 of the 1,216 trailers sold to T.M.E. in 1954. Of the trailers included in the sale, 400 were vans, 398 were reefers, and 16 were tank trailers. Total selling price was $3,904,000. As consideration for Fruehauf's agreement to take back these trailers, T.M.E. agreed to purchase from Fruehauf 400 new vans and 450 new reefers. The delivery date for the new trailers, which were longer and better insulated than the ones relinquished, was September 15, 1957.

During the period which transpired between 1954—the year in which the 814 older trailers had been purchased—and the time of their sale in 1957, T.M.E. had (with respect to these trailers) credited its depreciation reserves in the amount of $3,683,756.43. The effect of these entries was to give T.M.E. a date-of-sale basis (book value) in the assets sold of $1,688,756.47. The difference between the amount received from Fruehauf and T.M.E.'s basis was $2,215,243.53. However, instead of treating this $2,215,243.53 figure as gain from the sale of trailers, T.M.E. credited the sum to a receivable account marked "A/c Rec. Riss & Co." Its alleged reason for treating the $2,215,243.53 figure in this manner is best explained by the following agreement entered into by Riss and T.M.E. on January 16, 1957:

### AGREEMENT

WHEREAS, Transport Manufacturing & Equipment Co. owns and has under long term lease to Riss & Company, Inc. certain 1954 Fruehauf semi-trailers, which leases will expire on various dates following January, 1960,

WHEREAS, Transport Manufacturing & Equipment Co. now has an offer to purchase certain of these units which would require that Riss & Company, Inc. agree to cancel the existing leases on the units sold, and

---

[4] During the years 1955 and 1956, respectively, Riss reported losses of $2,920,593.50 and $1,668,709.30.

WHEREAS, the existing leases on these units are on a declining rental basis calling for higher rentals in the early years and lower rentals in the later years, and the cancellation of the leases would result in a sacrifice by Riss & Company, Inc. of the low rentals during the last months of the aforementioned leases.

NOW THEREFORE BE IT UNDERSTOOD, that Riss & Company, Inc. does hereby agree to the cancellation of the leases on the units which Transport Manufacturing & Equipment Co. desires to sell and that in consideration for the agreement by Riss & Company, Inc. to cancel the leases on the units sold that Transport Manufacturing & Equipment Co. does hereby agree to pay Riss & Company, Inc. an amount equal to the sale price above Transport Manufacturing & Equipment Co.'s book value on the sale of these units.

The price paid by Fruehauf for the used trailers being sold by T.M.E. was above market. It appears that Fruehauf ultimately agreed to pay T.M.E. this high amount in order to compensate Riss for the damages it had allegedly incurred as a result of the earlier referred to defects in the design of the trailers. Were this so, Riss, as a result of the "pass through" clause in the January 16, 1957, agreement with T.M.E., would, in fact, have been the beneficiary of any stepped-up price which Fruehauf agreed to pay for the used trailers. However, even though Riss and T.M.E. had once before employed a similar technique in reimbursing Riss for damages sustained as a result of faultily constructed equipment purchased by T.M.E. and leased to Riss, it is not altogether clear that Fruehauf regarded the sale price arrived at as accomplishing this end. Fruehauf never explicitly acknowledged any responsibility for the damages experienced by Riss; although in some instances, Fruehauf performed repair work on such vehicles at its own expense. At least during the preliminary stages of its negotiations with T.M.E., its method of arriving at the price paid for each of the trailers seemed to be consonant with the method normally employed by it in the purchase of any large number of used trailers. However, detracting from this consideration is the fact that Fruehauf's president, Roy Fruehauf, and Richard (T.M.E.'s board chairman) were best of friends and long-time business associates—factors which may have prompted Fruehauf to give vent to Riss' contentions in arriving at the selling price ultimately paid to T.M.E.

In respondent's notice of deficiency, the excess of the amount received by T.M.E. from Fruehauf over T.M.E.'s basis in the relinquished assets was treated as long-term capital gain to T.M.E. The only explanation which accompanied the resultant adjustment to T.M.E.'s income for the year 1957 contained the following language:

(c) It is determined that you realized long-term capital gains in the amount of $2,278,468.30 as shown on Exhibit B-1 attached, in lieu of $51,242.52 reported on your income tax return. Therefore, taxable income is increased in the amount of $2,227,225.78.

OPINION

The issue now before us concerns a transaction between two corporations, both controlled by the same family interests. The setting for

the issue is, therefore, a familiar one; however, the facts involved are somewhat unusual.

It is by now well established that taxpayers may arrange their affairs in whatever manner is best suited to their needs, tax or otherwise. *Hanover Bank* v. *Commissioner*, 369 U.S. 672, 688 (1962); *Henry C. Beck Builders, Inc.*, 41 T.C. 616 (1964); and *Cherry* v. *United States*, 264 F. Supp. 969 (C.D. Calif. 1967). As long as the means chosen to accomplish the ends sought comport with commercial reality, *Knetsch* v. *United States*, 364 U.S. 361 (1960), clearly reflect income, *Philipp Bros. Chemicals, Inc. (Md.)*, 52 T.C. 240, 251 (1969), are bona fide in nature, *Gregory* v. *Helvering*, 293 U.S. 465 (1935), and have not been used solely as a means of escaping taxes, *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422 (1949), the law will not ascribe to any such arrangement tax consequences other than those intended by the parties. *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950); *Granite Trust Company* v. *United States*, 238 F. 2d 670 (C.A. 1, 1956), remanding case to District Court.

In the case at bar, petitioner T.M.E. was brought into being for the sole purpose of providing its sister corporation—Riss—with a conduit through which Riss would be able to engage in purchasing practices which would otherwise have been encumbered by certain Interstate Commerce Commission regulations governing the purchasing activities of interstate motor carriers. Accordingly, from its naissance in 1938 to the years now before this Court, T.M.E.'s dominant purpose for being—literally its raison d'etre—was to purchase equipment needed by Riss, both rolling and stationary, and to then lease it to Riss for an annual stipend calculated to exceed T.M.E.'s depreciation deductions on such equipment by some nominal amount, usually $10 per month in the case of trailers. Aside from money received from the rental of its terminal facilities to other carriers, Riss was T.M.E.'s only source of income. Without the stream of rental payments arising from T.M.E.'s leasehold agreements with Riss, T.M.E. would have no way of satisfying its periodic obligations most of which were attributable to the purchase of equipment ultimately leased to Riss. From this relationship, the bona fides of which are not here in issue, nor contested by respondent in an earlier proceeding before this Court, see *Riss & Co., Inc.*, T.C. Memo. 1964-190, an inevitable form of dependency arose: whereas Riss was, by virtue of its status as lessee under the equipment leases entered into with T.M.E., indebted to T.M.E. and dependent upon it for the acquisition of new equipment, T.M.E. was abundantly aware of the fact that Riss' well being was inextricably connected with that of its own, and that any venture necessary to the continued economic

health of Riss (and requiring T.M.E.'s participation) was as much an elixir to T.M.E. as it was to Riss. Accordingly, when Riss decided that certain trailers which it had been renting from T.M.E. under a lease entered into in 1954 were so inadequate and fault-ridden as to deny it (Riss) the possibility of generating a profit from the use of such equipment, it seems clear that any effort on the part of T.M.E. to alleviate such a condition would, in the normal course of events, have been in its best interests. Accordingly, the problem which now confronts us is not one of pragmatism, but, instead, relates to the methodology employed by T.M.E. and Riss in their attempt to reverse the disastrous economic trend experienced by Riss in the 2 or 3 years prior to the transaction in question. However, before addressing ourselves to the merits of the key transaction before us—the lease cancellation agreement between Riss and T.M.E., and the events which influenced that document—we deem it important to first consider a procedural matter which has been raised by petitioner.

As indicated in our Findings of Fact, respondent's notice of deficiency with respect to the issue now under review contained no information useful to petitioner in ascertaining the theory on which respondent was proceeding. Similarly in response to the allegations raised by petitioner in its petition to this Court (and set out below),[5] respondent's only reply was to generally deny petitioner's contentions with respect to the existence of and reason for the January 2, 1957, pact entered into by Riss and T.M.E. By contrast, for the first time on brief (and long after the contents of the above document had been stipulated to by the parties) respondent enunciated his position as follows:

Respondent asserts that the 814 trailers were sold by petitioner at the insistence of Riss & Co., since it desired larger, more efficient, better refrigerated units so that it could more effectively compete in hauling perishable and frozen foods.

---

[5] "Calendar Year 1957

\*     \*     \*     \*     \*     \*     \*

"(c) The Commissioner erred in determining that petitioner realized a long-term capital gain in the amount of $2,278,468.30 in lieu of $51,242.52 as reported by petitioner on its income tax return, and erred in increasing petitioner's taxable income in the amount of $2,227,225.78.

\*     \*     \*     \*     \*     \*     \*

"(c) The long-term capital gains of petitioner were properly reported in the sum of $51,242.52, which sum represents the excess received by petitioner over the remaining basis of the depreciable assets sold by petitioner, less the sum of $2,215,243.52 which was allowed and paid by petitioner to Riss & Company as lessee for the cancellation of certain unexpired leases on the 814 Fruehauf trailers which were sold and transferred to Fruehauf, which transfer was only made possible by Riss & Company receiving the aforesaid amount as consideration for the releasing and cancelling of the remaining portion of the low rental periods of certain leases on the 814 Fruehauf trailers."

Accordingly, since Riss & Co. desired the new trailers it was unnecessary for T.M. & E. to pay Riss & Co. to cancel the lease. The payment by petitioner to Riss & Co. was not arms-length and was made merely to minimize the taxes of petitioner.

Petitioner, in its reply brief, questioned the propriety of permitting respondent to rely on an issue not raised in the pleadings. Our task is to decide whether petitioner's contention is correct.

We start our analysis by noting that the excerpt from respondent's brief quoted above did not specifically invoke the reallocation provisions of section 482 [6] and its predecessors. Nevertheless, we are of the opinion that, in the setting of this case, respondent's use of the phrase "arm's-length" indicates an intent on his part to raise section 482 by implication. See Income Tax Regs. 1.482–1(a)(6) where it is said in part that—

The term "true taxable income" means, in the case of a controlled taxpayer, the taxable income * * * which would have resulted to the controlled taxpayer, had it in the conduct of its affairs * * * dealt with the other member * * * of the group at *arm's length*. * * * [Emphasis supplied.]

Accordingly, even though we are aware of the oft-stated rule that issues raised for the first time on brief will not be countenanced by this Court, *J. William Frentz*, 44 T.C. 485 (1965), affd. 375 F. 2d 662 (C.A. 6, 1967), we, nevertheless, deem it appropriate to examine those cases where the dilatoriness of respondent in raising an issue under section 482 was the question considered by the Court. See, e.g., *Burrell Groves, Inc.*, 16 T.C. 1163, 1169 (1951), and *United States* v. *First Security Bank*, 334 F. 2d 120 (C.A. 9, 1964), affirming a District Court opinion. See also *Artnell Co.*, 48 T.C. 411 (1967), a section 446 case, in which *Burrell Groves, Inc.*, is distinguished.

Given the framework set out above, our reading of the cases has provided us with certain guidelines: (1) Because the powers vested in the Commissioner under section 482 are discretionary, the burden placed on the taxpayer is that of proving the arbitrariness of the Commissioner's determination. *National Securities Corp.* v. *Commissioner*, 137 F. 2d 600, 602 (C.A. 3, 1943), affirming 46 B.T.A. 562 (1942). Accordingly, where respondent has commenced his case without apprising the taxpayer of his (respondent's) intent to employ section 482, the resultant disadvantage to the taxpayer is usually substantial. *Commissioner* v. *Chelsea Products*, 197 F. 2d 620 (C.A. 3,

---

[6] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

1952), affirming 16 T.C. 840 (1951). Hence, where respondent has failed to plead section 482, and where the invocation of that section at a later point in the proceedings has worked a surprise and attendant disadvantage on the petitioner, respondent's attempt to rely on section 482 has been denied. See *Burrell Groves, Inc., supra;* and *Commissioner* v. *Chelsea Products, supra.* Compare *Ballentine Motor Co.,* 39 T.C. 348, 358 fn. 8 (1962). (2) On the other hand, where the petitioner has had good reason to believe that the Commissioner intended to invoke section 482, reliance on that section has been allowed even though not raised in the pleadings. See *Ballentine Motor Co., supra* (absence of surprise); *Nat Harrison Associates, Inc.,* 42 T.C. 601 (1964) (absence of surprise occasioned by respondent's reference to the section during the course of his opening remarks, coupled with petitioner's failure to protest use of the section); and *Burrell Groves, Inc., supra* at 1169, where the following language from that case, though dicta, suggests that the Court might have held differently had the facts adduced during the course of the trial put the petitioner on notice as to the theory on which respondent planned to rely:

There was no * * * explanation or indication as to how or in what manner this added amount of income was realized, and there was no showing that section 45, *supra,* [the forerunner of what is now section 482] or the bona fides of the transaction between the petitioner and its stockholders, was in any way involved in the determination. Neither was there anything in the respondent's answer setting up or allocating any part of the subsequent selling price of the crop between petitioner and its stockholders. Similarly, the respondent has at no time by any pleading raised any issue declaring that section 45 was applicable or had been applied. It is accordingly our conclusion that the record before us supplies no basis, either in issues raised *or on the record made,* for any application of section 45, *supra.* [Emphasis supplied.]

In the case at bar, we believe that respondent was derelict in failing to raise the "arm's-length" issue in his pleadings. See Rule 14, Tax Court Rules of Practice. Furthermore, our careful study of the record leads us to the firm conclusion that petitioner was not previously aware of any intent on the part of respondent to use the "arm's-length" argument first raised in his brief, and that petitioner would be placed at a severe disadvantage if respondent's dilatoriness in failing to raise this issue at an earlier time were to be condoned by this Court. Accordingly, whether we were to rely upon the general decisional law in this area, or the cases which we have surveyed under section 482, we would have to told that the above issue was raised too late and cannot now be considered by this Court. Compare *William Greenberg,* 25 T.C. 534, 537 (1955); *Sidney Messer,* 52 T.C. 440 (1969); and *Motel Corp.,* 54 T.C. 1433, 1441 (1970).

Returning to the merits, we deem it important to reiterate certain matters previously developed in our opinion. First we think it essen-

tial to note that the January 2, 1957, agreement between Riss and T.M.E. has been stipulated to by the parties. Similarly, it is also important to bear in mind that in an earlier case this Court approved the rental terms found in the leasehold agreement which was canceled by the January 2, 1957, document. Finally, we again note the interdependent nature of the businesses carried on by T.M.E. and Riss, and the fact that any commercial undertaking necessary to Riss' financial well being would also be in the best interests of T.M.E.— Riss' lessor and principal creditor. With these considerations in mind, and given Riss' tenuous financial condition, we have no reason to believe that the January 2, 1957, agreement was other than that which it purported to be; i.e., a means by which T.M.E. could terminate part of its lease with Riss—thereby relieving both T.M.E. and Riss of an economic albatross—without at the same time further endangering Riss' tenuous financial position by causing it to forfeit certain economic benefits which would have redounded to it had the leasehold agreement with T.M.E. been left unchanged. Under such circumstances, we see no basis for upsetting an agreement based upon what we perceive to be sound business judgment and precipitated by factors beyond the control of either contracting party. (Compare *National Lead Co.*, 40 T.C. 282 (1963), affd. (anent matters herein pertinent) 336 F. 2d 134 (C.A. 2, 1964), where the absence of a business purpose contributed to the Court's disapproval of the transaction in question.) As such, we attach little importance to the fact that, unlike most lease cancellation agreements where the lessee receives payment for giving up the lease, the agreement between T.M.E. and Riss may have been initiated at the behest of Riss. For had Riss been required to retain the trailers in question, the result may well have been financial disaster for both it and T.M.E. Moreover, though T.M.E. stood to lose the low rentals which it would have received under the terminated part of the lease (had Riss been capable of making such payments), it stood to gain the high "early year" revenues which would have accompanied the rental to Riss of the new trailers which it (T.M.E.) was obligated to purchase from Fruehauf. Accordingly, we reject any suggestion that the *purpose* behind the lease cancellation agreement entered into between T.M.E. and Riss was other than bona fide in nature.[7]

However, even though we have arrived at this conclusion, we still deem it necessary to examine the financial consequences of this agreement in order to determine whether any basis existed for crediting Riss with *all* of the gain "realized" by T.M.E. as a result of the used

---

[7] Similarly, even if we had determined that the "arm's-length" issue raised by respondent was properly before this Court, we believe the unusual facts of this case would have warranted a holding on that issue in favor of petitioner.

trailer sales agreement which it entered into with Fruehauf. Accordingly, since the reimbursement feature of the January 2, 1957, pact between T.M.E. and Riss was designed to protect Riss against the economic loss it would have incurred were no recognition given to the "high rental" payments it had made during the early years of its lease with T.M.E., we believe the best approach to the problem now before us is to determine whether the amount credited to Riss accurately reflects the difference between (a) the rentals Riss would have paid T.M.E. had the 814 trailers leased to Riss in 1954 been depreciated by T.M.E. on a straight-line basis,[8] and (b) the rental which T.M.E. actually charged. Accordingly, we have mapped out these two amounts in the schedules which follow.

SCHEDULE A

STRAIGHT-LINE DEPRECIATION BASIS FOR TRAILERS RENTED TO RISS DURING 1954

| Trailer type | Average [9] date placed in service | Cost | − 8.78% salvage value | = Depreciation basis | ÷ 72-month estimated life | = Depreciation per month per class of vehicle |
|---|---|---|---|---|---|---|
| Standard trailers (800) | 7/15/54 | $4,894,840 | $429,766.95 | $4,465,073.05 | | $62,015.00 |
| Reefers (400) | 7/ 1/54 | 3,451,510 | 303,042.58 | 3,148,467.42 | | 43,728.85 |
| Tank trailers (16) | 12/ 3/54 | 124,944 | 10,970.08 | 113,973.92 | | 1,583.00 |

[8] Returning to the example which appears in fn. 3 *supra,* we note that, in the case of an asset having a useful life of 6 years and having a basis of $6,000, employment of the double declining-balance method of depreciation yields a post-useful life salvage value of $526.05 ($6,000 — $5,473.95) or 8.78 percent of the asset's original $6,000 value. Accordingly, in determining the amount of depreciation T.M.E. would have recognized had it expensed the 814 trailers in question by using the straight-line method of depreciation (over the 6-year period involved), we will assign a salvage value to each trailer equal to 8.78 percent of its original value. (For useful information regarding the declining balance method of depreciation, see sec. 1.167(b)–2(a) and (b), Income Tax Regs.)

[9] See the following table:

AVERAGE DATE PLACED IN SERVICE
(Based upon date of mortgage, computed to closest month)

| | Number | × | Weight factor (derived from numeral associated with month of purchase) | = | Weighted month |
|---|---|---|---|---|---|
| | Standard trailers | | | | |
| 200 on 6/1/54 | (200 | × | 6 | = | 1,200) |
| 300 on 7/1/54 | (300 | × | 7 | = | 2,100) |
| 300 on 9/1/54 | (300 | × | 9 | = | 2,700) |
| 800 | 6,000÷800=7.5 =7/15/54 | | | | 6,000 |
| | Reefers | | | | |
| 75 on 6/1/54 | ( 75 | × | 6 | = | 300) |
| 225 on 7/1/54 | (225 | × | 7 | = | 1,575) |
| 50 on 8/1/54 | ( 50 | × | 8 | = | 400) |
| 50 on 9/1/54 | ( 50 | × | 9 | = | 450) |
| 400 | 2,725÷400=6.8 =7/1/54 | | | | 2,725 |

Tank trailers
16 on 12/3/54

## SCHEDULE B

IMPUTED RENT BASED UPON STRAIGHT LINE DEPRECIATION ON TRAILERS ACTUALLY SOLD

| Trailer type (total no. purchased) | Average date placed in service | Date taken out of service [10] | Total number purchased | Number sold | Ratio of number sold to total number purchased | Monthly depreciation on total number purchased × | Monthly straight line depreciation per units sold = | Number of months in service × | Imputed rent (straight line depreciation) on trailers sold = |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | *Percent* | | | | |
| Standard trailers (800)_____ | 7/15/54 | 1/16/57 | 800 | 400 | 50 | $62,015.00 | $31,007.50 | 30 | $930,225.00 |
| Reefers (400)_____ | 7/1/54 | 200 on 1/16/57 | 400 | 200 | 50 | 43,728.85 | 21,864.42 | 30.5 | 666,864.81 |
| | | 198 on 7/16/67 | | 198 | 49.5 | 43,728.85 | 21,645.78 | 36.5 | 790,070.97 |
| Tank trailers (16)_____ | 12/3/54 | 1/16/57 | 16 | 16 | 100 | 1,583.00 | 1,583.00 | 25.5 | 40,366.50 |
| Total imputed rent_____ | | | | | | | | | 2,427,527.28 |

## SCHEDULE C

DEPRECIATION ACTUALLY TAKEN (AND RENT ACTUALLY CHARGED BASED UPON SUCH DEPRECIATION) ON TRAILERS SOLD

| Trailer type | Date placed in service | Date taken out of service | Total months in service | Total number sold | Rental per unit [11] while in service × | Total rent paid per class of trailers sold |
|---|---|---|---|---|---|---|
| Standard trailers (800). | 7/15/54 | 1/16/57 | 30 | 400 | × 12 months at $180.79 = $2,169.48<br>12 months at 127.91 = 1,534.92<br>6 months at 91.52 = 549.12<br>30 — 4,253.52 = | $1,701,408.00 |
| Reefers (400). | 7/1/54 | 200 at 1/16/57 | 30.5 | 200 | × 12 months at 261.06 = 3,132.72<br>12 months at 183.34 = 2,200.08<br>6.5 months at 129.85 = 844.02<br>30.5 — 6,176.82 = | 1,235,364.00 |
| | | 198 at 7/16/57 | 36.5 | 198 | × 12 months at 261.06 = 3,132.72<br>12 months at 183.34 = 2,200.08<br>12 months at 129.85 = 1,538.20<br>.5 month at 92.50 = 46.25<br>36.5 — 6,917.25 = | 1,235,364.00 |
| Tank trailers (16). | 12/3/54 | 16 at 1/16/57 | 25.5 | 16 | × 12 months at 234.42 = 2,813.04<br>12 months at 164.87 = 1,978.44<br>1.5 months at 117.09 = 175.35<br>25.5 — 4,966.83 = | 79,469.28 |
| Total rent paid_____ | | | | | | 4,425,356.78 |

[10] Trailers marked as having been taken out of service on 1/16/57 were deliverable to Fruehauf any time prior to 4/15/57. Trailers marked as having been taken out of service on 7/16/57 were deliverable to Fruehauf any time prior to 9/15/57. However, since the petitioner has the burden of proof on this matter, and in the absence of any information indicating when actual deliveries were made, we have used the earliest possible delivery dates in determining the times at which these trailers were taken out of service.

[11] See the following table:

AVERAGE MONTHLY RENT PER REEFER DURING FIRST FOUR YEARS OF SERVICE

*Year 1*
186 at 260.43 = $48,439.98
214 at 261.60 = 55,982.40
400       104,422.38
$104,422.38÷400=$261.06 average rent per month, per unit.

*Year 2*
186 at $182.93 = $34,024.98
214 at 183.71 = 39,313.94
400       73,338.92
$73,338.92÷400=$183.34 average rent per month, per unit.

*Year 3*
186 at $129.56=$24,098.16
214 at 130.10= 27,841.14
400       51,939.30
$51,939.30÷400=$129.85 average rent per month, per unit.

*Year 4*
186 at $92.30=$17,167.80
214 at 92.67= 19,831.38
400       36,999.18
$36,999.18÷400=$92.50 average rent per month, per unit.

## SCHEDULE D

Comparison of (a) rent actually paid during period sold vehicles were in service, with (b) imputed rent based on straight-line method of depreciation.

(a) Rent actually paid_____ $4, 425, 356. 78
(b) Imputed rent based upon straight-line method
    of depreciation_____ 2, 427, 527. 28
(c) Economic value to Riss of lease cancellation_____ $1, 997, 829. 50
(d) Amount credited to Riss by T.M.E. as a result of January 2,
    1957, agreement regarding trailers to be sold to Fruehauf__ 2, 215, 243. 53

(e) Amount by which credit to Riss exceeded economic value of
    lease cancellation_____ 217, 413. 03

Based upon the comparisons disclosed by the above schedules, see particularly schedule D, lines (c) and (d), we conclude that a proper basis did exist for crediting Riss with $1,997,829.50 of the $2,215,243.53 gain realized by T.M.E. as a result of the used trailer sale which it transacted with Fruehauf. Accordingly, except for gain in the amount of $217,413.03, we hold for petitioner on this issue.

### Issue 2. 1960 Bad Debt Deduction by T.M.E.

#### FINDINGS OF FACT

The years 1954 through 1960 were not prosperous years for Riss. Operating revenue during this period declined from a high of approximately $30 million in 1954 to a low of about $3.9 million in 1960. Operating losses during this period were also mounting, and in 1960 the company experienced losses in excess of $800,000. Many of the factors responsible for this downturn in Riss' financial picture have already been discussed, and need not be reconsidered. Suffice it to say that, with each new reversal, Riss' trucking activities reeled. Many of the trucking routes assigned to it by the Commission were made to lie dormant—a factor which significantly cut into their value. Terminals were forced to close, and by the end of 1960 Riss was indebted to T.M.E. in the amount of $1,383,029.71.

During this difficult period Riss' efforts to stay the momentum of its financial troubles were significantly hampered by several law suits and by respondent's imposition, in 1958, of a jeopardy assessment amounting to some $4,900,000. Though the jeopardy assessment was abated on August 25, 1958, it was reimposed on September 14, 1960; and the attendant unfavorable publicity created by it severely affected Riss' ability to obtain commercial financing.

Institutions which might otherwise have been willing to loan Riss money were loathe to do so because of the jeopardy assessment lien on Riss' assets. Certain concerns did, however, continue to loan Riss desperately needed funds. Among these concerns were the Commercial

National Bank of Kansas City (hereinafter Commercial) and T.M.E. whose debt account with Riss rose to $1,559,001.54 in 1961. Though Commercial's reasons for pumping funds—albeit secured—into a concern as financially unstable as Riss are not altogether clear,[12] it seems fairly clear that T.M.E.'s lending activities were based upon the rather critical assumption that if Riss were allowed to fail, T.M.E. would be cut off from its primary source of income and it, too, would surely perish along with Riss.

As mentioned, the post-Korean War period ending with the year 1960 saw Riss (and T.M.E.) involved in several court battles. One of these disputes centered on equipment which had been obtained from Fruehauf during 1957. The dispute was resolved late in 1960 [13] by a judgment and execution in favor of Fruehauf in the amount of $826,942.04. Though Fruehauf, in the ensuing months, made attempts to collect this amount, it is not altogether clear whether its efforts were focused on defendant Riss, as opposed to defendant T.M.E. In any event, the amount was not collected during either 1960 or 1961.

Notwithstanding its declining revenues, increasing losses, and crippled financial condition, Riss, largely as a result of the contributions of Richard, continued as a going concern through each of the years herein relevant.[14] Nevertheless, with each contraction of its previously far-flung trucking network, Riss' vital organs were subjected to increased strain. Its balance sheet (unaudited) for the year ending December 31, 1960, showed a deficit in retained earnings of almost $2 million, and a deficit capital account of $1,270,193. Many of its trucking routes[15]—once the veins and arteries of its ranging commercial complex—were hardening with inactivity. Many of these once heavily traveled routes could not even be sold; indeed, a proposed $1 million sale in 1959 to the Buckingham Freight Lines of part of Riss' authority to operate in an area known as the Kansas City-Dallas-Denver triangle was denied by the Commission because Riss had allowed the route to lie dormant so long.[16]

---

[12] Commercial's loans to Riss were secured by Riss' accounts receivable.

[13] Though the (District Court) judgment was appealed by both parties, the judgment in favor of Fruehauf was immediately collectible by virtue of the fact that the appeal to the Circuit Court of Appeals was taken without bond.

[14] Though its financial condition worsened steadily until 1964 when Richard's son, Robert, took over control of the business, Riss' activities as a going concern were never interrupted. At the time of trial, it had reattained much of its former preeminence.

[15] Not valued on Riss' Dec. 31, 1960, balance sheet pursuant to various rules of disclosure established by the Commission.

[16] Pertinent excerpts from the Commission's report are as follows :

"In evaluating the documentary evidence adduced by applicants to depict the past operations of Riss in the Kansas-Oklahoma-Texas territory involved, the examiner stated in the prior report that no service had been performed by Riss from points in Kansas to the United-Buckingham eastern territory, and that, its service from Texas and Oklahoma points to such territory was so limited as to be nonexistent from a competitive standpoint, and he concluded, that to permit United-Buckingham to enter the involved area would confront existing carriers with an aggressive and capable competitor at the Kansas City

It was under these conditions that T.M.E's accountant and lawyer advised it that the $1,383,029.71 owed to it by Riss at the end of 1960 was uncollectible. T.M.E.'s attempt to treat this amount as a business bad debt [17] in an amended return for the year 1960, filed May 23, 1962, was disallowed by the Commissioner. Whether the Commissioner acted properly in denying the $1,383,029.71 deduction is the question now before us.[18]

### OPINION

Whether or not a debt has become wholly worthless [19] within a given taxable year is quite clearly a question of fact. *James M. Hawkins*, 20 T.C. 1069 (1953), and *Earl V. Perry*, 22 T.C. 968, 973 (1954). Ofttimes the question is close, and in most instances more than just the good-faith opinion of the creditor is required. *William F. Sanford*, 50 T.C. 823 (1968). Similarly, the mere fact that a business is on the decline, *Giles E. Bullock*, 26 T.C. 276, 300 (1956), affd. 253 F. 2d 715 (C.A. 2, 1958), or that it has failed to make a profit, *Rogers Peet Co.*, 21 B.T.A. 577 (1930), or that its obligation may be difficult to collect, *Frank J. Shippen*, 30 T.C. 716, 727 (1958), will not, without more, provide a creditor of that business with cause for treating its obligation as being worthless. On the other hand, though the law does require

---

gateway, and one which would have a far greater incentive than Riss in making a special effort to capture traffic moving northbound into the former's eastern territory. * * * [Footnote omitted.]

\* \* \* \* \* \* \*

"Although, as indicated, the record as now supplemented renders moot the previous objection to the transaction regarding United-Buckingham's financial fitness, a finding that the purchase price is just and reasonable is not justified on the present record. * * * The record shows that the operating rights involved are practically dormant to the extent that they authorize operations to and from points in Kansas and from points in Texas and Oklahoma to points in United-Buckingham's eastern territory and there is no showing that there was any real need for the re-institution of service under such rights by United-Buckingham. In the circumstances and in accord with the Commission's usual policy it would be necessary to cancel these rights prior to the consummation of the transaction if it is otherwise consistent with the public interest. * * * [93 M.C.C. 754.]"

[17] Riss' balance sheet (unaudited) for the year ending Dec. 31, 1960, reveals debts payable to T.M.E. in the amount of $1,388,603, as opposed to the $1,383,029.71 figure used above. Since the discrepancy between these two amounts is minimal, and since neither party has brought such discrepancy to our attention, we have, throughout, used the $1,383,029.71 figure—the amount which appears on petitioner's petition.

[18] In addition to treating the $1,383,029.71 owed to it by Riss as a bad debt for the year 1960, T.M.E., in the alternative, also treated this amount (as enlarged by credit extended to Riss during 1961) as a bad debt for the year 1961. However, even though a net operating loss carryback from the year 1961 would affect the years 1957–1960, we need not decide whether the bad debt deduction now before us, and taken by petitioner in 1960, would more appropriately fit within the later year, 1961. This is because the parties, by way of stipulation, have already determined the extent of petitioner's net operating loss for the year 1961.

[19] SEC. 166. BAD DEBTS.
   (a) GENERAL RULE.—
      (1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
Sec. 166(a)(2) has not been argued by the parties, and is, accordingly, not in issue.
      (2) PARTIALLY WORTHLESS DEBTS.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

a reasonable degree of certainty with respect to the uncollectibleness of an obligation, *Iowa Southern Utilities Co.* v. *United States*, 348 F. 2d 492 (Ct. Cl. 1965), it does not require that creditor be an "incorrigible optimist" in appraising his chances for collection. *MacDonald Engineering Co.*, 35 B.T.A. 3, 8 (1936), affd. 102 F. 2d 942 (C.A. 7, 1939).

Focusing on the case now before us, we note that, by 1960, Riss' place in the trucking industry had deteriorated to the point where its 1960 revenues were little more than 13 percent of what they had been in 1953. We also note that Riss was beleaguered by several law suits, and by respondent's jeopardy assessment. However, as crippled as Riss was in that year, we are not completely satisfied that its obligation to T.M.E. was then worthless.

Generally speaking, where a business, though faltering markedly, has been able to perpetuate itself as a going concern, the courts have been reluctant to hold that its debts during such a period of decline were so irredeemable as to be considered worthless. See, e.g., *City National Bank*, 11 B.T.A. 857 (1928), appeal dismissed per curiam 35 F. 2d 1016 (C.A. 8, 1929); *Miriam Coward Pierson*, 27 T.C. 330, 339 (1956), affd. 253 F. 2d 928 (C.A. 3, 1958); *Trinco Industries, Inc.*, 22 T.C. 959, 965 (1954); and *Frank J. Shippen, supra.* Even where the assets of such a business were so badly outweighed by its liabilities as to render it insolvent, the fact that it was able to struggle on as a viable concern has frequently been enough to preclude a showing of uncollectibleness. *W. D. Roussel*, 37 T.C. 235, 245 (1961); *Miriam Coward Pierson, supra;* and *Trinco Industries, Inc., supra*, wherein the Court held as follows:

Petitioner has failed to prove the worthlessness * * * of the debt owed to it by its Canadian subsidiary in the taxable year ending June 30, 1950. * * * While losing money, and insolvent to the extent that its liabilities exceeded the book value of its assets, it was still actively engaged in business on June 30, 1950, and continued to operate for more than a year thereafter. Evidence of insolvency based on book figures does not necessarily establish the worthlessness of debts. * * * [22 T.C. at 965.]

In our opinion, like the facts of many of the cases cited above, the facts of the within proceeding—though compelling—are not sufficient to warrant the result sought by petitioner.

We begin our analysis by acknowledging that Riss' obligations, as reflected by its balance sheet (unaudited) for the year ending December 31, 1960, did in fact exceed its assets by a ratio of more than 2 to 1; or, $2,058,933 to $988,740. Its debt to T.M.E., alone, stood at $1,383,029.71 (see fn. 17 *supra*); and its prospects, generally, were indeed dim. However, to our knowledge, T.M.E.'s writeoff of the cumulative debt owed to it by Riss at the end of 1960 was predicated on little more

than the fact that Riss was encountering grave difficulties during that year and would continue to encounter similar setbacks for the foreseeable future. This, as we have indicated earlier, is not enough to warrant a deduction for worthlessness, especially where, as here, the stricken company remains actively engaged in business. See *Giles E. Bullock*, *supra*, and *H. W. Findley*, 25 T.C. 311 (1955), affirmed per curiam 236 F. 2d 959 (C.A. 3, 1956). There was, for example, no showing as to what percentage of Riss' obligations to T.M.E. were long overdue—a consideration which we deem to be of no small importance in overcoming the fairly plausible suggestion that part or all of Riss' obligations to T.M.E. were too recently acquired to be considered hopelessly uncollectible.[20] Moreover, though Riss' balance sheet (unaudited) for the year ending December 31, 1960, did reveal the bleak asset-liability ratio referred to earlier, any conclusions to be drawn from this putatively unfavorable state of affairs must be tempered by the fact that not shown on Riss' balance sheet was its authority to operate the extensive trucking routes granted to it by the Commission. Granted, Riss' attorney assessed these rights to be worth not more than $1 million dollars by the end of 1960; however, as long as Riss continued to be a going concern, there always existed the possibility that it might one day restore these routes to their former value, by once again making them active.

To be sure, Riss' financial condition during 1960 was anything but sturdy. As previously mentioned, it was at about this time involved in several law suits; however, the amounts which it stood to gain or lose as a result of these contests were very much in doubt. Certainly the $826,942.04 judgment in favor of Fruehauf contributed to Riss' financial ills during this precarious period; however, even that judgment was on appeal—a fact which may have persuaded Fruehauf to forebear from levying on the assets of either Riss or T.M.E.[21]

Moreover, there is no question but that respondent's jeopardy attachment in 1960 significantly hampered Riss' ability to obtain credit,

---

[20] Riss' unaudited balance sheet for the year ending Dec. 31, 1960, reveals the following:

LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)

| Current liabilities: | | |
|---|---|---|
| Note payable—secured by assignment of freight accounts receivable | | $125, 639 |
| Drafts payable | | 123, 074 |
| Accounts payable and accrued expenses | | 805, 236 |
| Reported injury, loss and damage claims | | 79, 984 |
| Total current liabilities | | 1, 133, 933 |
| Amount payable to Transport Manufacturing & Equipment Co. (under common control with Riss & Company, Inc.) | $1, 388, 603 | |
| Less amount included in accounts payable and accrued expenses above | 463, 603 | 925, 000 |

[21] It appears that T.M.E.'s assets would have been sufficient to satisfy Fruehauf's judgment, had Fruehauf seen fit to go against T.M.E., as opposed to Riss, its codefendant.

and left it in doubt as to whether the assets used to secure the $4.9 million jeopardy assessment would be returned to it in time to stave off disaster. However, as punishing a blow as it was, there is no indication that either Riss or T.M.E. regarded the jeopardy assessment as the coup de grace. Riss' accountants, in a report to its shareholders, estimated that of the $4.9 million only $200,000 would ultimately be owed to respondent. Moreover, if T.M.E. viewed respondent's lien as a death knell to Riss' already sinking economy, it is unlikely that it would have continued to advance funds to Riss during 1961. Cf. *Powers Manufacturing Co.*, 7 B.T.A. 786 (1927), appeal dismissed 34 F. 2d 255 (C.A. 8, 1929); and *John W. Sherwood*, 8 B.T.A. 103 (1927). In so stating, we are aware of the fact that it may have been in T.M.E.'s best interests to continue Riss' open line of credit. Nevertheless, it is our feeling that the act of extending credit during 1961— albeit in the hope that Riss would one day revive itself—is inconsistent with the argument that respondent's lien in 1960 so decimated Riss' economy as to make its debt to T.M.E. wholly and irreparably worthless in that year.[22]

Based upon the entire record before us, we are unable to say that, as of December 31, 1960, Riss' economic prospects were so moribund as to render worthless its obligations to T.M.E.

*Issue 3. Various Deductions Associated With Certain Real and Personal Property Held by T.M.E.*

FINDINGS OF FACT

A. The Sixty-Third Street Property

Around February 1952, T.M.E. purchased, for $38,021.50, certain residential property located in the community of Shawnee Mission, Kans. The property (hereinafter referred to as the 63d Street property) was, from the time of its acquisition until May 31, 1956, occupied by Robert Riss and his family. During this time, it appears that the property served no other use.

On June 1, 1957, the 63d Street property was sold to an unrelated party for $34,500. Expenses associated with the sale of the property were in the amount of $1,762.95.

On petitioner's income tax return for the year 1957, various expenses allocable to the maintenance of the 63d Street property prior to its sale

---

[22] We believe the case of *William Purvin*, 6 T.C. 21 (1946), is distinguishable in that the taxpayer in *Purvin* made advancements in connection with a wholly new venture which had been entered into by its debtor.

were treated as deductible expenditures. Of those deductions disallowed by respondent the following are still in contest: [23]

| | |
|---|---|
| Depreciation | $491. 55 |
| Insurance | 152. 00 |
| Utilities | 100. 81 |
| Total | 744. 36 |

## B. The State Line Property

On May 10, 1949, T.M.E. purchased, for $97,021.08, certain residential property located at 6505 State Line, Kansas City, Mo. (hereinafter referred to as the State Line property). From the time of its acquisition until October 1, 1958, the State Line property was occupied by Richard's former wife, Louise, and their daughter, Louise Riss II.

During the period between October 1, 1958, and August 23, 1960, the date of its disposition to Richard, the property was unoccupied, and was listed for sale with a local realtor named Paul Hamilton. Because of its great size, the residential unit situated on the property was not very marketable as rental property; accordingly, little effort was directed toward making it available to the renting public.

Sometime subsequent to October 1, 1958, the boiler valve in the basement of the State Line property became stuck. As a result, water was forced to back up through the furnace unit, and a substantial amount of damage was caused by the resultant emission of steam. The plaster warpage and paint discoloration which resulted from the boiler malfunction contributed to the already difficult job of disposing of the large residence. In fact, when Richard purchased it on August 23, 1960, for the sum of $25,000, he was forced to invest another $30,000 to $35,000 in the structure to make it, once again, habitable. Its state of disrepair, no doubt, contributed to the relatively low price at which it was sold to Richard. The loss—$8,406.45—experienced by T.M.E. as a result of this sale was reflected on T.M.E.'s income tax return for the year 1960 as a deduction in arriving at section 1231 gain. However, on brief the impropriety of that deduction was conceded by petitioner

[23] In a document filed by both parties entitled "Stipulation Agreement Relating To Settlement Of Certain Issues" the following statement is made: "The petitioner requests the Court to determine whether the respondent properly refused to allow * * * a long term capital loss [in the amount of $5,284.45] resulting from the sale by petitioner of [the 63d Street property] * * *." However, our examination of petitioner's income tax return for the year 1957 indicates that a gain in the amount of $6,276.35, rather than the loss stated above, was realized by petitioner as a result of this transaction. Moreover, in determining petitioner's deficiency, respondent carried forward, unchanged, the amount of gain ($6,276.35) shown on petitioner's return. Accordingly, since we are unaware of any basis for the statement quoted above, we can only conclude that both parties are in agreement as to the amount of gain realized by T.M.E. as a result of its 1957 sale of the 63d Street property, and that the matter is not now before us.

(see sec. 267(a) through (c)), and is not now in issue. Similarly, respondent has conceded that (for purposes of the gain realized by Richard when he sold the State Line property in 1963) Richard was entitled to increase his basis by the amount of loss disallowed to T.M.E. (See sec. 267(d).)

In addition to the loss deduction described above, the following deductions, taken by T.M.E., and attributable to the State Line property, were disallowed by respondent:[24]

---

[24] Several documents relating to the above deductions have been filed by the parties. The first document, filed Oct. 7, 1968, and entitled "Stipulation of Facts" contains the following statement:

"The real estate taxes, depreciation and expenses in reference to the State Line house claimed by petitioner on its Federal tax return and disallowed by respondent for the period following October 1, 1958 until the sale of the house were as follows:

| "Period | Taxes | Expenses | Depreciation |
|---|---|---|---|
| Last quarter 1958 | | | |
| Calendar 1959 | $1,727.96 | $1,100.51 | $4,739.64 |
| Calendar 1960 | 1,143.35 | 1,695.29 | 2,183.64" |

This statement, when coupled with the passage from respondent's brief which follows, provides the strong suggestion that respondent's only concern (with respect to the State Line property) was centered on those transactions which occurred after October 1, 1958:

"During the short periods at issue herein, the properties were not placed on the market for rent. During those periods, petitioner was merely attempting to liquidate nonbusiness assets which it could not use. The mere discontinuance of using the properties by the Riss family does not change their character previously established as nonbusiness assets. * * * The record does not show that members of the Riss family could not have again occupied the unfurnished West 63rd Street or furnished 6505 State Line properties."

However, in a document filed by the parties on Oct. 9, 1968, and entitled "Stipulation Agreement Relating To Settlement Of Certain Issues," the following statement is made:

*"Calendar Year 1958*

\* \* \* \* \* \* \*

"(a) Petitioner will not contest the correctness of $3,046.86 of the $16,676.83 [the amount by which expenses attributable to the operation of the State Line property during the year 1958 exceeded rental income received during that portion of the year when the property was occupied by Richard's former wife and daughter] involved in the adjustment referred to in subparagraph (a) [of petitioner's petition]. Respondent concedes that $2,906.47 of said $16,676.83 was incurred for deductible expenses and $10,723.50 of said $16,676.83 represents depreciation deductions claimed and not included in Depreciation Exhibit A attached. The deductibility of the $6,550.96 detailed below is to be determined by the Court:

"Depreciation, 6505 State Line Building _____ $2,455.06
Depreciation, 6505 State Line, Furn. & Fixtures _____ 4,095.90
                                                                  _____
Total _____ 6,550.96"

Although the import of the above passage seems to be quite clear—a conclusion which immediately places it at loggerheads with the two earlier statements which we have set out above, a further investigation of the Oct. 9 document seems to indicate that the parties had already reached an understanding with respect to all depreciation taken on the State Line property prior to Oct. 1, 1958. The language referred to appears as follows:

"Except as noted in the immediately following paragraphs, the petitioner and respondent hereby stipulate and agree that the attached Exhibits A through F [wherein no depreciation deductions arising from the State Line property were allowed for any of the years 1957-1960] reflect the allowable deductions, of the petitioner, for depreciation and amortization.

\* \* \* \* \* \* \*

"The petitioner requests the Court to determine whether it is entitled to depreciation deductions with respect to a building known as 6505 State Line for the period Oct. 1,

| Year | Depreciation (building) | Depreciation (furniture & fixtures) | Utilities | Expenses | Total |
|---|---|---|---|---|---|
| 1959 | $2, 455. 06 | $2, 284. 58 | $413. 72 | $686. 79 | $5, 840. 15 |
| 1960 | 1, 636. 71 | 546. 93 | 521. 25 | 1, 174. 04 | 3, 878. 93 |

## C. Automobiles Owned by T.M.E., and Used by Various Members of the Riss Family

During the years 1958 and 1959, T.M.E. claimed long-term capital losses arising from the sale of certain automobiles which it had owned. The following chart reveals the amount of loss realized on the disposition of each of these vehicles:

| Automobile | Month of sale | Loss on sale |
|---|---|---|
| 1953 Lincoln | November 1958 | $4, 344. 82 |
| 1954 Oldsmobile | April 1959 | 4, 370. 48 |
| 1951 Plymouth | April 1959 | 1, 790. 33 |

Because these automobiles had been, during the entire period they were owned by T.M.E., devoted to the personal use of T.M.E.'s shareholders and their wives, respondent disallowed all losses associated with their disposition. The question presented for our determination is whether respondent acted properly in disallowing such losses.

### OPINION

Focusing our attention on the losses claimed by petitioner as a result of the dispositions described in our Findings of Fact for issue 3, we again note that no controversy exists with respect to the loss realized by T.M.E. on the sale of the State Line property to Richard. Accordingly, the only loss deductions still disputed by the parties are those related to the sale of the automobiles enumerated in our Findings of Fact. With respect to these transactions, respondent's primary objection to the capital losses sought by T.M.E. is that the vehicles and property sold were, while in the hands of T.M.E., items of personal property not used in T.M.E.'s business, and purchased by it solely for the use of various members of the Riss family. As such, respondent's assertions—though applicable to an individual taxpayer—must be rejected in the present context where the taxpayer before us is a corporation.

---

1958 to the date in 1960 when said property was sold by the petitioner."

Accordingly, since there appears to be no issue as to the depreciation taken on the State Line property for the period Oct. 1, 1958, through Dec. 31, 1958, inclusive (see stipulation dated Oct. 7, 1968, *supra* this fn.) and since it appears that the parties have, of their own accord, resolved (or have treated as being resolved) all questions relating to depreciation on that property taken prior to Oct. 1, 1958, we have not seen fit to disturb this state of affairs by extending our investigation of this question beyond the years 1959 and 1960.

This is so because, unlike the treatment accorded to individual taxpayers under section 165(c) of the Code, wherein losses are limited to three categories one of which is losses "incurred in a trade or business," no equivalent section exists for losses sought by corporations.[25] The legislative history which follows amply bears out this point.

Under the Internal Revenue Code of 1939, separate provisions for the treatment of losses experienced by individuals and corporations, respectively, appeared as follows:

SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\*      \*      \*      \*      \*      \*      \*

(e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

    (1) if incurred in trade or business; or

    (2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or

    (3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwrecks, or other casualty, or from theft. No loss shall be allowed as a deduction under this paragraph if at the time of the filing of the return such loss has been claimed as a deduction for estate tax purposes in the estate tax return.

(f) LOSSES BY CORPORATION.—In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.

When the 1954 Code was adopted, section 23(e) was carried forward as section 165(c). However, no literal counterpart to section 23(f) was drafted into the scheme of section 165. Instead, a general provision, which now appears as section 165(a)—"General Rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."—was adopted. As evidenced by the committee reports relating to section 165,[26] the congressional intendment behind this new provision was simply to bring together, in a more workable format, several of the 1939 Code rules relating to the treatment of losses. As such, there was no intention to eliminate or modify the rule which formerly appeared in section 23(f) or the 1939 Code, and which placed no limitation on the type of loss a corporation would be entiled to deduct.

---

[25] For similar reasons we reject any suggestion that sec. 262—

SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES.

Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses.

has application to the facts of this question. In our estimation the phrase "personal, living, and family expenses" cannot reasonably be interpreted to cover the activities of a non-individual taxpayer such as the corporate taxpayer herein. No argument to the contrary has been raised by respondent.

[26] "Section 165. Losses

Rules for the treatment of losses contained in various subsections of section 23 of the 1939 Code have been brought together in section 165.

"The general rule for losses of individuals (sec. 23(e)) and the rule for corporations (sec. 23(f)) become subsections (a) and (c). * * * [H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. A46 (1954).]"

Accordingly, if our analysis of the 1954 statute is correct, it would seem that, without regard to the use to which the items in question were put while held by T.M.E., the losses experienced by T.M.E. as a result of their disposition were clearly deductible under section 165 of the Code. Moreover, since there is no controversy with respect to T.M.E.'s characterization of such losses as capital losses, we hold that the losses in question were properly deductible by T.M.E. to the extent permitted by section 165(f).

Having resolved the above, we now turn to the question of whether the expenses enumerated in our Findings of Fact and incurred by T.M.E. in connection with the 63d Street and State Line properties were properly deductible under sections 167(a)(2) and 212(2). (Section 162 will also be considered.)

Generally speaking, where property has been held for the personal use of a taxpayer, a deduction under either section 167(a)(2) or 212(2) will be denied unless it can be shown that a conversion of the property occurred, and that, for the years in issue, it was held for the production of income. *Marjorie M. P. May*, 35 T.C. 865 (1961), affd. 299 F. 2d 725 (C.A. 4, 1962). Usually, this question arises in the context of an individual taxpayer who has abandoned his place of residence, and who is seeking a deduction for the cost of maintaining that property prior to sale (see e.g. *William C. Horrmann*, 17 T.C. 903, (1951); *E. R. Fenimore Johnson*, 19 T.C. 93 (1952); and *Mary Laughlin Robinson*, 2 T.C. 305 (1943)), although in the *Marjorie M. P. May* case, the subject matter which generated the deductions there in question was a yacht. However, whatever the nature of the asset, the claimant taxpayer in these cases is invariably a noncorporate entity. Hence, the case law that has developed in this area has centered around the activities of individual taxpayers. Whether these rules should be extended to a corporate taxpayer in a case such as the one now before us is a question which we believe must be answered in the affirmative.

In the present case, it is clear that prior to May 31, 1956, and October 1, 1958, respectively, the 63d Street and the State Line properties were held by T.M.E. for the personal enjoyment of its shareholders. *Riss & Co., Inc., supra*, affd. (with respect to pertinent matters) 374 F. 2d 161 (C.A. 8, 1967). As such, during the occupancy of these persons the properties were held by T.M.E. neither as part of its trade or business, nor for the production of income. See *International Trading Co. v. Commissioner*, 275 F. 2d 578 (C.A. 7, 1960), affirming a Memorandum Opinion of this Court; and *Challenge Manufacturing Co.*, 37 T.C. 650, 659 (1962). Accordingly, if T.M.E. is to receive a deduction for expenses attributable to these properties during the time they were

not occupied by T.M.E.'s shareholders and their families, it must show that subsequent to the departure of these persons there was a conversion of the property from property held primarily for the pleasure of its shareholders to either property used in its trade or business (secs. 162 and 167 (a) (1) ) or property held for the production of income (sec. 167 (a) (2) ).

With respect to the first argument, i.e., that during this time the houses were used in T.M.E.'s trade or business, we think it is clear that at no time during this interim period was there any connection between T.M.E.'s business activities and the maintenance of these properties. Although it is arguable that any property held by a corporation for sale is property held by it in connection with its trade or business, we think it pretty well settled by now that to be considered part of a corporation's trade or business, property must at least have been purchased with a *view* to using it in the commercial activities of the corporation. *Carter-Colton Cigar Co.*, 9 T.C. 219, 221 (1947) ; *Alamo Broadcasting Co.*, 15 T.C. 534, 535 (1950). See also *Graves Brothers Co.*, 17 T.C. 1499, 1506 (1952), wherein we said "It is easily conceivable that a corporation might acquire real property for uses other than its trade or business."

Focusing on the instant proceeding, we have already held in an earlier case (*Riss & Co., Inc., supra*) that, while occupied by T.M.E.'s shareholders and their families, these properties were not held by T.M.E. for business purposes. In like fashion, there is no indication in this case that T.M.E. requested its shareholders and their families to vacate the two houses so that they might finally have been put to some appropriate business use. Indeed, the evidence suggests a contrary view, viz, that T.M.E. wished to divest itself of these commercially unusable properties as soon as the market would permit. Accordingly, whether we look at T.M.E.'s intent subsequent to or during the occupancy of the properties by its shareholders and their families, we cannot conclude that T.M.E. ever held these properties with a view to using them in its trade or business.

With the above in mind, all that remains to be considered is whether there was a conversion of the two houses from property held primarily for the pleasure of T.M.E.'s shareholders into property held for the production of income. We believe this question must also be answered in the negative.

In *Frank A. Newcombe*, 54 T.C. 1298 (1970), this Court stated that in cases dealing with the alleged conversion of a residence from personal to income-producing property the "key question * * * is the purpose or intention of the taxpayer in light of all the facts and circumstances," and that "If the taxpayer is merely seeking to

recover his investment [in a residence] or a part thereof, it will be difficult to find that the property was 'held for the production of income.'"

In the instant case we find no basis for holding that T.M.E.'s purpose in placing the two houses in question up for sale was other than to recoup all or part of its original investment in these properties. There is no evidence that T.M.E. sought to hold the properties for post-abandonment appreciation—a factor which was deemed to be critical in *Newcombe*. Indeed, the listing for sale of the State Line property soon after it was vacated by Richard's former wife, and the loss which was experienced on the sale of both of the properties strongly militate against the suggestion that they were held with a view toward realizing any kind of profit attributable to the post-abandonment activity of the real estate market.

The fact that the State Line property was too large to put on the rental market merely explains why the rental of that property was not a feasible post-conversion pursuit. It does not, ipso facto, establish the existence of some other income-producing motive adequate enough to support the deductions herein sought. Nor, in light of the fact that we have been provided with no evidence regarding the market value of the State Line property immediately after its abandonment, can we say that the boiler malfunction damage inflicted on this property affects T.M.E.'s case one way or the other. At best it only explains why the price to Richard was so very low. Accordingly, on the facts presented, we hold that neither the State Line property nor the 63d Street property were held for the production of income during the time periods in issue.[27]

*Issue 4. Net Operating Loss Carryback Attributable to the Year 1960*

### FINDINGS OF FACT AND OPINION

Whether T.M.E. was entitled to a net operating loss carryback arising from the year 1960 quite obviously depends on whether T.M.E. incurred a net operating loss during that year. Since in our resolution of issue 2 we held that the debt owed T.M.E. by Riss did not become worthless in 1960, the possibility of T.M.E.'s having incurred a net operating loss in that year has been eliminated. Accordingly, the issue now before us has been rendered moot. This being so, we hold that T.M.E. was not entitled to a net operating loss carryback from the year 1960.

---

[27] This conclusion is also warranted by the fact that no evidence was introduced to show that, during their respective periods of abandonment, T.M.E.'s shareholders were foreclosed from reentering these properties, and once again appropriating them to their personal use. Compare *Charles F. Neave*, 17 T.C. 1237, 1243 (1952).

## Issue 5. 1963 Bad Debt Deduction by Richard

FINDINGS OF FACT

On October 26, 1962, the following letter of guarantee, written by Richard, was addressed to a Mr. B. Ruysser, executive vice president of the Commercial National Bank, Kansas City, Kans.:

DEAR MR. RUYSSER:

This letter is to acknowledge that I agree to personally guarantee any liability contracted to the Commercial National Bank by Riss and Company, Inc.. and/or Transport Mfg. & Equipment Company of Delaware, only as respects the borrowing of money on accounts receivable.

It is understood that from time to time, Riss & Company may borrow money from the Commercial National Bank having assigned physical freight bills as collateral providing a 10% margin on excess collateral. Such loans should be evidenced by 90-day promissory notes at an interest rate of 6½% per annum.

It is further understood and agreed that should any such freight bills become uncollectible or over 60 days old, they will be removed and relieved from the collateral and replaced by current collectible bills. Such loans have been and will be guaranteed by both Riss & Company, Inc., and Transport Mfg. & Equipment Company. . . . such guarantee already set forth in instruments that have previously been executed.

I hereby personally corroborate and supplement the extant guarantees of Riss & Company and Transport Mfg. & Equipment Company with my own personal guarantee, only as respects to the borrowing of funds from the Commercial National Bank, through the assignment of accounts receivable as described herein.

Very truly yours,

R. R. RISS, SR.

Pursuant to the terms contained in the above letter, Commercial loaned Riss amounts equaling $125,000. Of this amount, $20,000 was loaned on May 31, 1963, and the remaining $105,000 was loaned on June 10, 1963.

During August 1963, Commercial became concerned about the accounts receivable collateral on its loans to Riss. Deeming itself insecure, Commercial called upon both Riss and Richard to pay the outstanding indebtedness of $125,000. Since Riss claimed it could not pay, and since Richard felt it would have been futile to attempt to borrow the money on behalf of Riss, authorization was given to Commercial to charge Richard's checking account for $125,000. Notwithstanding this setback, Richard continued to guarantee loans made to Riss. These guarantees extended beyond the year 1963. Similarly, a ledger sheet of Commercial indicates that a new loan was made to Riss on December 6, 1963.

In the opinion of Riss' attorney, Robert L. Jackson, the debt obligation to Richard, which arose as a result of his having satisfied Riss'

obligation to Commercial, was uncollectible in the year 1963. As a consequence, the $125,000 was treated as a business bad debt on Richard's return for that year. Whether respondent was correct in disallowing Richard's treatment of the above transaction is the question now in issue.

OPINION

Much of what we have said in issue 2 applies with equal force to the present issue; the only difference being that in 1963—the year now under review—Riss' financial prospects were considerably more dismal than they had been in 1960—the year covered by our earlier discussion. Even so, we do not believe that the obligation which arose in favor of Richard during 1963 may properly be treated as having become worthless in that year.

As we have earlier stated, the law does not require that a creditor be an incorrigible optimist in appraising his chances of collecting a questionable debt. *MacDonald Engineering Co., supra.* However, if by his conduct, he chooses to be an optimist in evaluating the economic condition of his debtor, he will usually find the going rough if he *later* decides to adopt a chameleon-like stance, and claim that the amounts owed to him had, all along, been worthless. Hence, in issue 2, we treated as significant the fact that T.M.E. continued to extend Riss credit even after that period in time when T.M.E. considered its accounts with Riss to be worthless. In so holding, we acknowledged that it may have been in T.M.E.'s best interests to continue extending credit to Riss in the hope that Riss might one day have emerged from its economic doldrums. Nevertheless, we concluded that T.M.E.'s conduct in continuing to extend Riss credit was inconsistent with the proposition that Riss' earlier obligations had become worthless. *Powers Manufacturing Co., supra; John W. Sherwood, supra;* and *New York Water Service Corporation,* 12 T.C. 780, 792 (1949), in which it was said that: "Where a creditor voluntarily advances further large sums to a debtor as petitioner did, it can hardly assert the worthlessness of the account on which the new advances were made."

Returning to the immediate question, it is not disputed that Richard continued to guarantee Riss' obligations even after Riss had defaulted on the $125,000 in notes owed to Commercial. In like fashion, Richard testified that he loaned money to Riss in 1964, and that had it been within his power, he would not have been reluctant, during this time, to loan Riss an additional $125,000. Accordingly, by analogy to that part of our reasoning in issue 2 depicted above, we are unable to hold that Richard incurred a bad debt of $125,000 during the year 1963.

*Issue 6. The Pittman Road Property*

FINDINGS OF FACT

During the years 1957 through 1963, inclusive, Richard owned an 82-acre tract of land located at 10601 East 43d Street, Kansas City, Mo. (hereinafter referred to as the Pittman Road property). Of the 82 acres, 40 were wooded and had been purchased by Richard in 1937. The remaining acreage had been acquired by Richard sometime thereafter, the total cost to Richard being $25,450. Situated on the property was an 11-acre lake.

Only one major building—a two-story structure—stood on the property. Built originally as a barn, during 1956 the structure had been converted into a house at a cost to Richard of $66,678.04. Thereafter Richard, who had, at that time, recently remarried, moved into the remodeled structure with his wife. Although on his income tax returns for the years 1956 through 1959, Richard listed the property as his residence, it appears that the house was occupied by Richard and his wife very sparingly during this period. It was, however, always available to them for whatever purposes they chose.

During the years 1957 through 1963, the Pittman Road property was never placed on the rental market; it was, however, always listed for sale. At various times during this period, serious consideration was given to using the property as a cemetery, amusement park, or apartment development. Due to favorable growth trends in the Kansas City area, the Pittman Road property steadily increased in value until at the time of the hearing herein it was valued at almost $900,000.

During the years under consideration, Richard used the Pittman Road property to raise and breed various animals. Among the animals bred were appaloosa horses, sheep, geese and there were several species of wild birds. The extent to which the property was used for such purposes is not clear. However, certain costs associated with the care and sale of these animals were treated as deductible expenditures on Richard's income tax returns. These expenditures were disallowed by respondent as follows:

TABLE 1

| Year | Feed | Medicine and veterinary | Shearing sheep | Loss on sale of livestock |
|------|------|------------------------|----------------|---------------------------|
| 1957 | $328.84 | $59.50 | | |
| 1958 | 295.80 | 71.50 | | |
| 1959 | 642.94 | 273.50 | $44.50 | $40.83 |
| 1960 | 1,516.89 | 150.00 | 65.25 | |
| 1962 | 66.97 | | | |
| 1963 | 538.58 | 15.00 | | |

Respondent also disallowed the deduction of other expenditures incurred by Richard in connection with the Pittman Road property. For the years indicated they were as follows:

TABLE 2

| | 1957 | 1958 | 1959 | 1960 | 1962 | 1963 |
|---|---|---|---|---|---|---|
| Seed and plants | $23.50 | | | | | |
| Supplies | 165.02 | $93.29 | $7.14 | $116.25 | | $602.65 |
| Cost repairs and maintenance | 604.06 | 722.67 | 382.85 | 500.12 | $1,060.27 | 577.39 |
| Fertilizers and lime | 1,016.09 | | | | | |
| Gasoline and other fuel | 172.42 | | 73.58 | 198.65 | | |
| Utilities | 455.43 | 802.80 | 1,222.63 | 1,079.68 | 1,281.18 | 1,161.89 |
| Depreciation | 554.36 | 781.97 | 3,724.38 | 3,399.88 | 5,896.82 | 4,997.45 |
| Labor | | 99.00 | | | | |
| Advertising | | | | 9.60 | 6.51 | |
| Miscellaneous | | | | 131.63 | 381.25 | |
| Rock wall destroyed and not rebuilt | | | | | [28] 7,044.82 | |

The above expenditures (when coupled with allowable deductions for real estate taxes) exceeded income from the Pittman Road property by the following amounts:

TABLE 3

| | 1957 | 1958 | 1959 | 1960 | 1962 | 1963 |
|---|---|---|---|---|---|---|
| Sale of livestock | | | ($40.83) | $404.95 | | |
| Rental income | $900.00 | $3,000.00 | 2,400.00 | 2,400.00 | $1,800.00 | $2,400.00 |
| Sale of wool | | | | 238.92 | | |
| Total reported income | 900.00 | 3,000.00 | 2,359.17 | 3,043.87 | 1,800.00 | 2,400.00 |
| Deductions claimed | 3,725.15 | 3,342.29 | 6,964.05 | 7,380.42 | [29] 16,968.01 | 9,187.99 |
| Deficit | (2,825.15) | (342.29) | (4,604.88) | (4,336.55) | (15,168.01) | (6,787.99) |

Whether respondent acted properly in disallowing the deductions enumerated above is the question we must now consider.

OPINION

In general, where property is held for the purpose of realizing a gain on its disposition, expenses attributable to the maintenance of such property are deductible. See sec. 1.212–1(b), Income Tax Regs. The question is one of fact, and unless a bona fide profit-making motive can be discerned, a deduction under section 212(2) or 167(a) (2) cannot be sustained. *Margit Sigray Bessenyey*, 45 T.C. 261, 273 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967). In the instant case, peti-

[28] In 1956, a rock wall was constructed on the Pittman Road property at a cost to Richard of $11,890. Because the wall was constructed as a "dry wall," i.e., no cement was employed in its construction, it was extremely vulnerable. From the time it was erected, it continually showed the effects of inclement weather. Finally, in 1962, the wall had deteriorated to the point where Richard thought it appropriate to tear it down. As a consequence, about 60 percent of the wall was torn down in 1962. The footnoted deduction of $7,044.82 purportedly reflects the estimated value of this portion of the wall.
[29] Includes $7,044.82 deduction attributable to destruction of the stone wall.

tioner contends that he purchased the Pittman Road property as an investment, and that any personal uses to which the property may have been put were merely incidental. See *Theodore B. Jefferson,* 50 T.C. 963 (1968); and *Westmore Willcox,* 20 T.C. 305 (1953). Though we judge the question to be very close, we agree with petitioner. However, in the main, we are unable to grant the deductions sought because petitioner has not established, to our satisfaction, that the expenditures involved were ordinary and necessary to the "management, conservation or maintenance" of his investment property. See sec. 212.

We focus initially on those expenditures which were incurred in connection with petitioner's breeding activities. Although the breeding and raising of animals may, in the proper context, constitute an income-producing activity, we do not believe that the circumstances of this case warrant such a conclusion. To our knowledge, no connection existed between the raising of these animals and the maintenance of the Pittman Road property for future sale, or for use as development property. Nor do we find grounds for concluding that the raising of these animals constituted a separate and independent income-producing endeavor, related to the Pittman Road property only by reason of location. Accordingly, we hold that Richard's breeding activities amounted to little more than a hobby or pastime, and that the deductions taken for veterinary services, feed, and shearing costs were not allowable under section 262. The same holds true for those depreciation deductions which were directly attributable to the cost of such animals, as well as to those depreciation deductions which were connected with equipment and shelter facilities purchased for their benefit.

With respect to the remaining depreciation deductions, our study of petitioner's income tax returns for the years in issue reveals that such deductions were primarily attributable to (a) the converted barn or (b) the rock wall which, in part, abutted this structure. As to the barn, we are of the opinion that the cost of renovating this structure during 1956 was a personal expenditure and that all amounts expended thereto were not subject to depreciation. Our conclusions are borne out by the fact that the project seems to have been undertaken solely for the purpose of making the structure habitable as petitioner's personal residence—a motive which we do not associate with the maintenance of property held for the production of income. Similarly, we do not think it would be appropriate to grant depreciation deductions under section 167(a)(2) with respect to the rock wall since it is not at all clear to us that the wall was ever intended to benefit petitioner's investment property. Instead, it appears that the wall was built for personal reasons, and that in 1956—the year of its construction—it

was merely thought of as a desirable adjunct to the then newly converted residence property which was soon to be occupied by Richard and his new wife.[30]

The deduction taken by petitioner in 1962 with respect to the dismantling of the rock wall in that year was also properly denied by respondent since it was not proven that the events which took place in that year constituted a "sudden" and "unexpected" loss within the meaning of section 165(c)(3). See *Ray Durden*, 3 T.C. 1 (1944); *Fay* v. *Helvering*, 120 F. 2d 253 (C.A. 2, 1941); and *Marko Durovic*, 54 T.C. 1364 (1970). Instead it appears to us that the destruction of the wall was the product of a "steadily operating cause," *Fay* v. *Helvering, supra*, brought about by the way it had been constructed.

Of the remaining deductions, only the expenditures for "repairs and maintenance," "gasoline and other fuels," and "utilities" were shown to have been incurred in connection with the maintenance of the Pittman Road property as income-producing property. These are, accordingly, deductible under section 212(2). Those deductions not mentioned above were properly denied by respondent, in that petitioner has neither shown that such expenditures were, in fact, incurred, or that they were incurred in the amounts claimed.

*Issue 7. Purchase by Richard of Niles & Moser Stock Held by T.M.E.*

### FINDINGS OF FACT

On May 30, 1955, T.M.E. purchased for $150,000 a 50-percent shareholder interest in the following corporations:

| Name | State of incorporation | Principal place of business |
|---|---|---|
| Niles & Moser Cigar Co. (hereinafter Niles) | Missouri | Kansas City, Mo. |
| Niles & Moser Cigar Co. of Colorado (hereinafter Niles Colorado) | Colorado | Denver, Colo. |
| Southwest Cigar Co. (hereinafter Southwest) | Missouri | Dallas, Tex. |
| William A. Stickney Cigar Co. (hereinafter Stickney) | Missouri | St. Louis, Mo. |
| Nine Hundred Bannock Avenue, Inc. (hereinafter Bannock) | Colorado | Denver, Colo. |
| Irving Boulevard Building Co., Inc. (hereinafter Irving) | Missouri | Dallas, Tex. |

The above corporations had been organized to acquire the assets of certain preexisting cigar companies. The cost of acquiring these assets was about $2,700,000. Of this amount $215,000 had been bor-

---

[30] With regard to depreciation taken on items such as "fence," "dirt dam" and "freezer," we have no way of knowing whether such amounts were incurred in connection with the Pittman Road property, in general, as opposed to specific items such as the converted farmhouse, the rock wall and the various items of breeding equipment. Accordingly, the depreciation deductions taken with respect to these items are also disallowed.

rowed from T.M.E., $215,000 had been borrowed from R. O. Stenzel & Co.—the owner of the other 50-percent shareholder interest in the corporations, and the remainder had been financed through a bank. The loans made by T.M.E. and Stenzel were subordinated to the amounts borrowed from the bank.

Due to the fact that Roy Stenzel, the owner of R. O. Stenzel & Co., was to provide essential managerial services to the corporate group (hereinafter N&M or the N&M Group), it was agreed that he would have the right to name 3 of the 5 directors for each company.

On the dates indicated below, the earned surplus account for each of the corporations in the N&M Group was as follows:

TABLE I: EARNED SURPLUS

| Corporation | 5/21/55 | 2/29/56 | 2/28/57 | 2/28/58 | 2/28/59 |
|---|---|---|---|---|---|
| Niles | | $62,694 | $139,864 | $210,744 | $322,736 |
| Niles Colorado | | 26,334 | 62,679 | 108,616 | 164,220 |
| Southwest | | 16,721 | 32,939 | 56,956 | 87,114 |
| Stickney | | 9,959 | 3,446 | 8,641 | 22,621 |
| Bannock | | 8,575 | 17,980 | 33,166 | 49,683 |
| Irving | | 7,417 | 17,145 | 27,934 | 40,916 |
| Total | | 131,700 | 274,053 | 446,057 | 687,290 |

Because of the large amounts owed to the bank, none of the corporations in the N&M Group paid any dividends during the time period covered by Table I. As a result, all after-tax net income earned during this period was credited to the respective earned surplus accounts depicted above. The following table of after-tax net income for the N&M Group may, therefore, be used to trace the development of the earned surplus accounts shown in Table I. Also reflected below is the average annual after-tax net income earned by these corporations during the two time periods indicated:

TABLE II: AFTER TAX NET INCOME

| Corporation | 5/21/55 to 2/29/56 | Year ended 2/28/57 | Year ended 2/28/58 | Year ended 2/28/59 | Average annual after-tax net income | |
|---|---|---|---|---|---|---|
| | | | | | 5/21/55 to 2/28/58 | 5/21/55 to 2/28/59 |
| Niles | $62,694 | $77,170 | $70,880 | $111,992 | $75,870 | $85,400 |
| Niles Colorado | 26,334 | 36,345 | 45,937 | 55,604 | 39,100 | 43,470 |
| Southwest | 16,721 | 16,218 | 24,017 | 32,158 | 20,500 | 23,100 |
| Stickney | 9,959 | (6,513) | 5,195 | 13,980 | 3,110 | 5,990 |
| Bannock | 8,575 | 9,405 | 15,186 | 16,517 | 11,940 | 13,150 |
| Irving | 7,417 | 9,728 | 10,789 | 12,982 | 10,060 | 10,800 |
| Total | 131,700 | 142,353 | 172,004 | 243,233 | 160,580 | 181,910 |

On September 9, 1958, T.M.E. sold Richard its 50-percent shareholder interest in the N&M Group. The price Richard paid for the stock of the six corporations was a follows:

| | |
|---|---|
| Niles | $65,000 |
| Niles Colorado | 25,000 |
| Southwest | 15,000 |
| Stickney | 20,000 |
| Bannock | 12,500 |
| Irving | 12,500 |
| Total | 150,000 |

These amounts corresponded to T.M.E.'s aggregate basis in the stock being sold.[31] The events which led to this sale, and to the deficiency determination which arose therefrom, will now be discussed.

For a period of about 2 years prior to 1958, respondent's agents had been conducting an extensive audit of T.M.E.'s books and records. This audit culminated in a jeopardy assessment of $2,300,000 which was levied during 1958. However, on August 25, 1958, the jeopardy assessment was abated in favor of the following agreement which was designed to safeguard and preserve T.M.E.'s assets, but which, at the same time, permitted T.M.E. to sell certain nonproductive assets in order to obtain much needed working capital:

AGREEMENT

\*       \*       \*       \*       \*       \*       \*

WHEREAS, the District Director has heretofore caused jeopardy assessments to be made against Transport Manufacturing & Equipment Company and Riss & Company, Inc.; and

\*       \*       \*       \*       \*       \*       \*

WHEREAS, the taxpayers, Transport Manufacturing & Equipment Company and Riss & Company, Inc. are contesting their respective liabilities for taxes in the Tax Court of the United States; and

WHEREAS, this Agreement is made and executed by the parties hereto for the purpose of providing the District Director, his successor or assigns, with additional security for the collection of the said tax liabilities of the taxpayers and avoiding the dissipation of assets in which either the Government or the taxpayers or the individual stockholders of the taxpayer corporations may have an interest, and to permit the continued operation of the respective businesses of the taxpayers and the safeguarding, conservation and preservation of their assets and the value thereof in order to assure the existence of the business of the taxpayers until the deficiencies shall be finally determined by the Tax Court or appropriate court of review, and shall have been paid in full.

Now, THEREFORE, for and in consideration of the mutual promises and covenants herein set forth, the parties hereto agree as follows:

The District Director covenants:

(a) That he will abate the said jeopardy assessments under the provisions of Section 6861(g) of the Internal Revenue Code of 1954 and release the said liens.

The taxpayer, Transport Manufacturing & Equipment Company, covenants:

\*       \*       \*       \*       \*       \*       \*

---

[31] At this time T.M.E. also sold Richard the $215,000 in subordinated notes which it had received from the N&M Group. Richard paid T.M.E. $215,000—the full face value of the notes.

(c) No property of the taxpayer, Transport Manufacturing & Equipment Company, real, personal or mixed, of any nature whatsoever, shall be transferred or in any way encumbered, pledged or hypothecated except upon immediate written notice to the Director, his successors or assigns, said written notice to be delivered within seventy-two (72) hours in all transactions involving an amount in excess of Fifteen Thousand Dollars ($15,000.00). None of the proceeds received by Transport Manufacturing & Equipment Company from said transactions will be withdrawn from the business for other than operating purposes.

\* \* \* \* \* \* \*

In addition to the foregoing, the parties respectively stipulate and agree among themselves as follows:

\* \* \* \* \* \* \*

2. The parties agree that during the continuance of this Agreement, Transport Manufacturing & Equipment Company and Riss & Company, Inc., will not, without the District Director's written consent, declare or pay any dividends, create or issue any additional capital stock or shares of stock of any character whatsoever, whether presently authorized or not.

\* \* \* \* \* \* \*

5. It is mutually agreed that this document shall not affect or restrict the District Director in any way from assessment and collection, as provided by law, of any liabilities of Riss & Company, Inc., and Transport Manufacturing & Equipment Company finally determined to be due in cases now pending before the Tax Court of the United States in Dockets 74950 and 74952, or from assessment and collection of any other liabilities which may hereafter be asserted. Neither shall it preclude the District Director from again making jeopardy assessments against the parties to this Agreement should it hereafter be deemed necessary for protection of the Government.

\* \* \* \* \* \* \*

7. The parties agree hereto that all rights, authority and obligations created by this Agreement shall be expressly conferred and binding upon the District Director and his successor or successors in office, the taxpayers and other parties to this Agreement, their heirs, devisees, executors, administrators, successors, transferees or assignees.

Pursuant to the terms of the above agreement, T.M.E., by letter dated August 28, 1958, notified the district director of its interest in selling certain assets which, in its opinion, were nonincome producing. This letter appears as follows:

Mr. E. O. BOOKWALTER, *District Director*
*Internal Revenue Department*
*Federal Court House*
*Eighth & Grand Avenue*
*Kansas City, Missouri*
Attention: Mr. Earl R. Torgeson, [sic] Chief, Collection Unit
DEAR MR. TORGESON: [sic]

Confirming conversation had with yourself and Mr. Hemilton by the undersigned and Mr. Waters August 28th, 1958, please be advised that Transport Manufacturing and Equipment Co. owns certain assets which in my estimation are extraneous to the business operations and are not satisfactorily income producing factors in the business. As I stated in our conversation, it strikes me as exercising good business judgment for the corporation to convert these assets into cash operating capital. They are as follows:

1. Dirt moving equipment at a book value of approximately $43,000. With respect to this item, the corporation sustains an expense of about $500 per month.

2. The Bratton-Mansfield oil leases in Kansas, which although producing, show a very small net return and require further cash outlay from time to time.[32]

3. Stock in Niles & Moser Cigar Company at a cost of $150,000. Although this company is making money, dividends will not be paid for a number of years because of the indebtedness of the company.

4. Vacant properties at South Bend at a cost of $25,000. This property was purchased in anticipation of obtaining rights to get into South Bend, which did not materialize and accordingly is not income producing at this time.

5. Vacant properties at Kansas City, Missouri at cost of $7,500.00. This property, likewise, is not income producing.

6. A residence at 6505 State Line at a book value of $45,000.00 and one at 2435 Drury Lane at a book value of $50,000, which likewise should be disposed of. These properties have been on the market for several years and I believe we should continue to endeavor to find a buyer.

In accordance with the terms of the Agreement heretofore executed between the undersigned and others, with the District Director, none of the proceeds of the sale of any of the above shall be used for anything but providing working capital for the business. None of the property will be sold at less than book value. In the event it appears to be impossible to dispose of any of the items for book value, we shall advise you prior to the consummation of the negotiations with respect to such items.

Further in accordance with our Agreement, the Director will be notified within seventy-two hours of the disposition of any of the property which is covered by the agreement.

I shall appreciate your advising me that you have no objection to the action proposed herein.

Very truly yours,

TRANSPORT MANUFACTURING & EQUIPMENT CO.
R. R. RISS, SR., *President*

On September 2, 1958, the following letter was written to T.M.E. in response to its letter of August 28:

Mr. R. R. RISS, SR.
*President, Transport Manufacturing and Equipment Co.*
*Riss Building*
*15 West 10th Street*
*Kansas City, Missouri*
DEAR MR. RISS:

Thank you for your letter of August 28, 1958, in which you notified us of your intention to dispose of certain properties to obtain additional cash operating capital.

We will interpose no objection to your proposed action and we appreciate the courtesy of your notifying us in advance.

Very truly yours,

E. O. BOOKWALTER
*District Director*
By: E. L. TORGERSON
*Chief, Collection Division*

---

[32] As of Jan. 1, 1958, T.M.E.'s adjusted basis in the Bratton-Mansfield oil leases was $78,452.21.

The district director's authorization to sell the assets enumerated in the August 28 communication came at a time when T.M.E. was very much in need of cash to satisfy a $400,000 bank note which was then due. Accordingly, when Roy Stenzel declined to purchase the shares of stock which T.M.E. held in these corporations, T.M.E. was left with little time to dispose of the stock. Believing that an outsider would not be interested in making such a purchase, Richard agreed to buy the stock at a price of $150,000.

As mentioned earlier, in addition to the N&M stock, Richard also purchased the $215,000 in subordinated notes which had been issued to T.M.E. by the six N&M corporations. The $365,000 received by T.M.E. as a result of these sales was immediately applied toward T.M.E's $400,000 obligation to the bank. The remaining $35,000 was satisfied by way of a 90-day note.

Richard's feeling that an outside party would not have been interested in the N&M stock was, in part, premised on the belief that few, if any, prospective investors would have been willing to buy a 50-percent interest in a closely held corporate group which was not only managed by the owner of the other 50-percent shareholder, but which was also subject to the direction of a board of directors which was under his control. He also questioned the likelihood of attracting outside capital to a business (such as the cigar business of the N&M Group) which was (1) subject to a jeopardy assessment, and (2) totally dependent upon suppliers who could, for any reason, discontinue their activities on 90 days' notice, and who required Richard's personal guarantee with every purchase made by a member corporation.

In an amendment to his answer, respondent determined that Richard's purchase of the N&M stock constituted a bargain purchase, and that the difference between (a) the sale price of $150,000, and (b) the amount ($342,000), which respondent determined to be the fair market value of these shares, represented a dividend distribution to Richard. The method by which respondent arrived at his $352,000 valuation is illustrated by the following table [33] in which average after-tax earnings of the N&M Group for the periods May 21, 1955, to February 28, 1958, and May 21, 1955, to February 28, 1959 (see Table II *supra*), were capitalized at a rate of 25 percent, i.e., by a factor of 4:

---

[33] Respondent also employed a net worth-liquidation table in arriving at his $342,000 valuation. In this table, average net worth for the two time periods shown above was reduced by an amount equal to 10 percent of all assets other than cash. The valuation yielded by this computation ($323,923) was then treated as the amount which would have been received by a 50-percent shareholder if the corporations comprising the N&M Group had been liquidated at about the time of the Richard-T.M.E. sale.

TABLE III: FAIR MARKET VALUE OF N&M GROUP STOCK, AS DETERMINED BY RESPONDENT

| Corporation | (A) Average annual earnings 5/21/55 to 2/28/58 | (B) Average annual earnings 5/21/55 to 2/28/59 | (C) Average of columns (A) & (B) | (D) 4 times column (C) | (E) 50% of column (D) |
|---|---|---|---|---|---|
| Niles | $75,870 | $85,400 | $80,635 | $322,540 | $161,270 |
| Niles Colorado | 39,100 | 43,470 | 41,285 | 165,140 | 82,570 |
| Southwest | 20,500 | 23,100 | 21,800 | 87,200 | 43,600 |
| Stickney | 3,110 | 5,990 | 4,550 | 18,200 | 9,100 |
| Bannock | 11,940 | 13,150 | 12,545 | 50,180 | 25,090 |
| Irving | 10,060 | 10,800 | 10,430 | 41,720 | 20,860 |
| Value of 50% shareholder interest | | | | | 342,490 |

Whether, as respondent contends, the sale of N&M stock to Richard should be treated as a constructive dividend in the amount claimed by respondent is the issue presented. Because this question was raised for the first time, in an amendment to respondent's answer, the burden of proof rests with him.

### OPINION

Although, as a general rule, income does not arise from the purchase of corporate property, *Lester E. Dellinger*, 32 T.C. 1178 (1959), such may be the case where the transaction "is in purpose or effect used as an implement for the distribution of corporate earnings to stockholders." *Palmer* v. *Commissioner*, 302 U.S. 63 (1937). Hence, where corporate property is sold to a stockholder at less than its fair market value, the transaction may be regarded as a bargain purchase with the "bargain" element being taxed to the shareholder as a dividend. *Southern Ford Tractor Corporation*, 29 T.C. 833 (1958); and *Stanley V. Waldheim*, 25 T.C. 839 (1956), affd. 244 F. 2d 1 (C.A. 7, 1957). Contrawise, where the amount paid by the stockholder is at least equal to the fair market value of the property being purchased, the sale cannot be regarded as a bargain purchase since the "net worth of the corporation is not diminished by such a transaction." *Southern Ford Tractor Corporation, supra* at 842. Accordingly, if in the present case, we are unable to conclude that the $150,000 paid to T.M.E. by Richard was less than the fair market value of the stock being sold, no basis will exist for upholding the position taken by respondent. Our principal task, therefore, is to determine whether the stocks sold to Richard were worth more than $150,000 on the date of sale.

As revealed by respondent's published pronouncements on the subject, the valuation of closely held stock is not an easy task. See Rev. Rul. 59-60, 1959-1 C.B. 237. Because of the limited market which usually confronts persons who wish to sell such shares, many courts have

looked to "intangible" or "intrinsic" factors in arriving at a valuation. Among the factors which have been considered are: (a) The loss of indispensable corporate management, *Estate of J. D. McDermott*, a Memorandum Opinion of this Court dated Apr. 30, 1953, affd. 222 F. 2d 665 (C.A. 7, 1955); (b) trends in the earnings record of the corporation, *Snyder's Estate* v. *United States*, 285 F. 2d 857, 862 (C.A. 4, 1961); (c) the value of the underlying assets held by the corporation, *Trianon Hotel Co.*, 30 T.C. 156 (1958); (d) the capacity of the corporation to pay dividends, *O'Bryan Bros.* v. *Commissioner*, 127 F. 2d 645 (C.A. 6, 1942), affirming 42 B.T.A. 18 (1940); (e) the fact that the stock being valued constitutes less than a controlling interest, *Central Trust Co.* v. *United States*, 305 F. 2d 393, 432 (Ct. Cl. 1962); and (f) the capitalized value of the corporation's past earnings, *Tecla M. Straub*, 29 B.T.A. 216, 221 (1933), affd. 76 F. 2d 388 (C.A. 3, 1935).

Rarely is any one of the factors enumerated above used as an exclusive yardstick. Similarly, no single formula exists for determining the amount of weight to be accorded each of the factors which might be deemed relevant. *O'Malley* v. *Ames*, 197 F. 2d 256 (C.A. 8, 1952). Accordingly, each case must be judged on its own merits, with the trier of fact doing his fallible best to stay within the perimeter of well established guidelines of judicial thought, while at the same time giving proper regard to the inevitable peculiarities of the fact pattern presented. In the instant proceeding, we have given our careful consideration to all the evidence presented, and to the arguments of the parties. We have also given proper regard to the fact that the burden of proof with respect to the immediate issues rests with respondent. As a result, we have determined that the fair market value of the shares of stock of the N&M Group purchased by Richard on September 9, 1958, was $246,000.

In arriving at our determination we have accorded a fair amount of weight to the fact that the after-tax earnings of the six N&M corporations nearly doubled from the time T.M.E. purchased the stock of these corporations in 1955 to the date of the T.M.E.-Richard sale in 1958. With this in mind, we find it difficult to believe that while N&M's earnings were increasing so prodigiously the fair market value of its stock remained static. Even so, we are somewhat reluctant to conclude that this factor alone supports the valuation which respondent has ascribed to the N&M stock. This is because theoretical worth, such as that based upon a corporation's earnings, is little more than conjecture unless it can be shown that the value being theorized would in the real world, be agreeable to a ready, willing, and able buyer. In this case, we think it unlikely that an outsider would have been willing to pay the price which respondent argues the stock was worth.

We, in part, base our conclusions on the voting and managerial control which such an investor would have had to cede to Roy Stenzel. We also regard as being extremely important the fact that the N&M Group was dependent upon suppliers who were in a position to terminate their selling activities on very short notice. We cannot help but think that such a state of affairs, if known to a would-be purchaser, would have had a depressing effect on the price of the stock. Of similar importance to a would-be investor would have been the fact that (during 1958) N&M was, by virtue of Stenzel's preeminence, a one-man business, and that were he to leave, N&M's fortunes would most likely suffer.

Notwithstanding the above, we believe that had T.M.E. looked for an outside purchaser, it could have obtained more than $150,000 for the N&M stock. We believe such a purchaser would have balanced the negativing factors we have described above against such positive factors as (a) the liquidation value of N&M's assets, (b) the rate of growth in its after-tax income, and (c) the capitalized value of its past earnings based upon a multiplication factor similar to that used by respondent. These things being so, we believe a valuation of $246,000 fairly reflects the fair market value of the N&M stock at about the time of the purchase in question.

In so holding, we have not overlooked the fact that, around the time of the sale, Richard was anxious to supply T.M.E. with money needed for its bank loan, and that a purchaser willing to pay more than the $150,000 paid by Richard may not have been obtainable within the time period available. However, we believe this consideration is offset by the fact that Richard could have easily deferred action on the N&M stock, and still have provided T.M.E. with the needed capital of $150,000. This could have been accomplished by the simple expedient of having T.M.E. sell him some of the other assets enumerated in the letter of August 28, 1958, almost all of which were eventually purchased by Richard and/or members of his family.

Having arrived at the above conclusions, it only remains for us to determine whether the sale to Richard was "in purpose or effect," *Palmer* v. *Commissioner, supra,* equivalent to a dividend. In arriving at such a determination we need not be influenced by the fact that the transaction in question took the form of a sale as opposed to that of a formal dividend declaration, see *Elizabeth Suzan Strake Trust,* 1 T.C. 1131, 1136 (1943), or that the intent of the parties was to avoid a distribution of earnings, *A. A. Emmerson,* 44 T.C. 86 (1965). For, as stated in *Lester E. Dellinger, supra:*

Whether the transfer or sale of property to the stockholder constitutes a dividend to him for income tax purposes is not controlled by the intent of the parties to the transaction but depends upon the circumstances and actual effect of the particular transaction. * * * [32 T.C. 1182.]

In this regard we note the following language from *Timberlake* v. *Commissioner*, 132 F. 2d 259 (C.A. 4, 1942), affirming 46 B.T.A. 1082 (1942), in which four shareholders purchased property, from a corporation controlled by them, at a price which was less than fair market value:

It is of no importance that the transfer assumed the form of a sale and that there was no express declaration of a dividend. The substance of the transaction determines its character for purposes of taxation; and we need only inquire whether the Columbia corporation transferred to the taxpayer and its other stockholders without cost a part of its earnings and profits so that they were severed from and ceased to be a part of the corporate property in which the stockholders had an indirect undivided interest and became their separate and independent holding, of which they could dispose at will. Certainly this was the effect of the sale, for the increment of value represented by the difference between the purchase price of the stock paid by the corporation in 1928 and its value in 1936, when it was sold at cost to the stockholders, was transferred by the corporation to them as effectually as if a one-third interest in each share of the Charleston stock had been distributed to the Columbia shareholders in the form of dividends. * * * [132 F. 2d 261.]

The principles enunciated in *Timberlake* have been consistently followed by the courts. See, e.g., *V. U. Young*, 5 T.C. 1251, 1257 (1945); *Shunk* v. *Commissioner*, 173 F. 2d 747 (C.A. 6, 1949), reversing and remanding on other grounds 10 T.C. 293 (1948); *Southern Ford Tractor Corporation, supra;* and *Lester E. Dellinger, supra.* Occasionally, however, dividend treatment has been avoided where a corporation has had no recourse but to sell property to a shareholder at a bargain price, provided that the same price would have been charged an outsider. This was so in *Robert Lehman*, 25 T.C. 629 (1955), a case which dealt with the sale of warrants to purchase whiskey. The warrants there in issue entitled shareholders of the selling corporation's parent to purchase whiskey from it at the maximum price permitted by the OPA. Because of the scarcity of whiskey at that time, the warrants were in great demand. Accordingly, when the OPA soon thereafter allowed the shareholders to sell their warrants at a price of $3.46, the question arose as to whether the resultant gain should be treated as capital gain or dividend income. In holding that the value of the warrants was not taxable to the shareholders as dividends, the Court employed the following rationale:

It is true that petitioners, and the other stockholders of Park & Tilford, Inc., who exercised their whiskey options, made a bargain purchase. They purchased an extremely scarce commodity at its wholesale price. But this bargain purchase is not the same type of bargain as that found in *Eastern Carbon Black Co.* v. *Brast*, 104 F. 2d 460 (C.A. 4, 1939), upon which respondent relies. In that case, corporate assets were sold to the stockholders at prices less than the corporation could have obtained for such assets in the open market. In the instant case, the Import Corporation charged every penny it was legally permitted to; * * *

Although a real economic benefit was conferred upon the stockholders of Park & Tilford, Inc., a benefit similar in nature was conferred upon the regular customer of the Import Corporation to whom it sold whiskey at the same price. Not every such benefit conferred upon a stockholder is to be regarded as resulting in the distribution of a dividend. * * * [25 T.C. 634.]

In the case at bar, we have already held that T.M.E. could have obtained a higher price for the N&M stock than the price paid by Richard. Accordingly, *Lehman* is inapposite; and, no issue having been raised as to T.M.E.'s earnings and profits during the year,[34] we believe the facts of the present case fall squarely within the rationale of *Timberlake* and the other cases cited above. See also section 1.301–1(j), Income Tax Regs., which reads as follows:

If property is transferred by a corporation to a shareholder which is not a corporation for an amount less than its fair market value in a sale or exchange, such shareholder shall be treated as having received a distribution to which section 301 applies. * * *

Moreover, the fact that the sale to Richard may have been activated by a genuine business purpose, i.e., T.M.E.'s need for cash, does not assist petitioner's cause. For, while such need may explain why T.M.E. saw fit to deal with its principal shareholder, it does not, ipso facto, justify the sale of stock to him at a price which was less than fair market value. These things being so, we hold that the purchase of the N&M stock by Richard resulted in a constructive dividend to him in the amount of $96,000—the difference between the fair market value of the stock ($246,000) and the amount ($150,000) which he paid to T.M.E.[35]

*Issue 8. Net Operating Loss Carryback from Year 1963 to Year 1960*

FINDINGS OF FACT AND OPINION

On his income tax return for the year 1960 Richard reported a tax liability in the amount of $25,819.38. However, on June 22, 1964, Richard filed an application for a carryback adjustment to the year 1960 in the amount of $30,439.60—which amount was alleged to represent his net operating loss from the year 1963. Based upon this carry-

---

[34] On Jan. 1, 1958, T.M.E.'s accumulated earnings and profits were in excess of $204,800.

[35] Although not raised in their pleadings, on brief, petitioners urge us to uphold their position on the theory of estoppel. However, since estoppel is an affirmative defense which must be specifically pleaded and proven by the party who wishes to rely upon it, we do not think it would be appropriate to consider herein the merits of a claim so tardily raised. See *Estate of Thomas E. Steere*, 22 T.C. 79 (1954), affd. sub nom *Rhode Island Hosp. Tr. Co.*, 219 F. 2d 923 (C.A. 1, 1955) ; the *Carnegie Center Co.*, 22 T.C. 1189 (1954) ; and *Alfred Fortugno*, 41 T.C. 316, 322 (1963), affd. 353 F. 2d 429 (C.A. 3, 1965). Suffice it to say that had petitioner's claim been properly raised, the results we have reached herein would not, in any way, have been changed. See *Elizabeth Lewis Saigh*, 36 T.C. 395, 423 (1961), in which certain elements necessary to a defense of estoppel, and lacking in this case, are discussed at length.

back adjustment, Richard claimed a refund of $15,478.90 for the year 1960. This amount, plus interest, was refunded to petitioner on November 6, 1964.

On March 17, 1966, respondent mailed to Richard a notice of deficiency for the years 1962 and 1963. In this notice, it was determined that Richard owed a deficiency in income tax for the year 1963 in the amount of $83,077.01 (an amount which quite obviously presupposed the absence of a net operating loss for that year). Later on, as a result of his determination with respect to the year 1963, respondent filed a motion requesting that he be allowed to amend his answer in docket No. 3794–62. Respondent's motion was granted on February 9, 1968. The amendment which followed requested a determination of Richard's income tax liability for 1960 in a manner which would not only reflect the deficiencies already claimed by respondent for that year but which would, in addition, increase Richard's tax liability by the amount of the refund described above. (See sec. 6214(a).) The appropriateness of this request is the question to be considered.

Both parties recognize that the present question is controlled by our decision in issues 5 (1963 bad debt deduction taken by Richard) and 6 (the Pittman Road property deductions). Accordingly, since we have, in the main, resolved those issues in favor of respondent, we must here, also, hold in his favor.

To reflect the conclusions reached herein, as well as the many agreements reached by the parties,

*Decisions will be entered under Rule 50.*